**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon VELARDE–GOMEZ,
Defendant–Appellant.**

**No. 99–50602.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 2000

Filed Sept. 13, 2000

As Amended Oct. 13, 2000

Terri L. Goodman, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Maura F. Quinn and Patrick K. O'Toole, Assistant United States Attorneys, Appellate Section, Criminal Division, United States Attorney Office, San Diego, California, for the plaintiff-appellee.

Before: WALLACE, TROTT, and GOULD, Circuit Judges.

WALLACE, Circuit Judge:

Ramon Velarde–Gomez appeals from his conviction of importation of marijuana in violation of 21 U.S.C. §§ 952, 960, and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

I

Velarde–Gomez, a United States resident alien who is a citizen of Mexico, attempted to enter the United States from Mexico at the San Ysidro, California, port of entry around 5:20 p.m., January 23, 1999. He was the driver and sole occupant of a 1983 Grand Marquis. At the primary inspection point, he told Agent Rodriguez of the United States Customs Service (Customs) that he "had gone down to Mexico for the day to visit with friends and do some drinking" and was returning home to Hemet, California, which is about 95 miles north of San Ysidro. He said he purchased the Grand Marquis 20 days earlier from someone in Palm Springs, California, and produced title to the automobile, which was still in the previous owner's name.

Agent Rodriguez asked Velarde–Gomez to open the trunk and drive to the secondary inspection point. Velarde–Gomez was taken to the nearby security office. At secondary inspection, a drug dog alerted to the Grand Marquis's fuel tank. There, agents found sixty marijuana packages weighing a total of 63 pounds with a street value in nearby San Diego of $53,400. The marijuana-full tank could hold less than two gallons of fuel. Agents also found trinkets, clothes, a book, a toothbrush, and lipstick in the automobile.

At 10:00 p.m., Customs Agents Salazar and Wilmarth took Velarde–Gomez to an interview room. Agent Salazar, who inspected Velarde–Gomez's automobile, told him that they found 63 pounds of marijuana in it; Velarde–Gomez did not speak or physically respond. At some point thereafter—the record does not specify how long—Agent Salazar read *Miranda* rights to Velarde–Gomez. Velarde–Gomez waived these rights and subjected himself to questioning.

Before trial, Velarde–Gomez filed a motion to suppress incriminating statements made during interrogation because he was not informed, pursuant to Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77 (Convention), that he could contact the Mexican consulate. He also filed a motion in limine seeking to exclude evidence of his silence and demeanor. The district court denied the motion to suppress all statements based upon the Convention violation, and initially granted the motion to suppress evidence of Velarde–Gomez's pre-*Miranda* warning silence and demeanor. At trial, the government asked for clarification of the court's decision denying the motion in

limine because Velarde–Gomez later waived his right to silence and talked to the Customs agents. Specifically because of the subsequent *Miranda* waiver, the district court changed its previous decision and ruled that the government could present evidence of Velarde–Gomez's post-arrest, pre-*Miranda* silence.

At trial, Agent Salazar related what occurred when he and Agent Wilmarth interviewed Velarde–Gomez after discovery of the marijuana:

Q: Now, when you first started asking the defendant questions, did you tell him what had been found in the vehicle?

A: Yes, I did.

Q: And what did you tell him?

A: I told him that 63 pounds of marijuana had been found in the gas tank of the vehicle he was driving.

Q: And what was his response?

[Defense]: Objection, your honor, based upon the previous thing we talked about.

The Court: Overruled.

A: I told him that. Before we give the Miranda rights, we always mention why they're there.

Q: Okay. And what was his response when you told him there was marijuana found in the vehicle?

A: There was no response. He didn't look surprised or upset or whatever.

Q: So he just sat there?

A: Yes.

Q: Did he say anything?

A: No.

Q: Did he deny knowledge?

A: No.

Q: Now, after you told—after you told him about the marijuana in the car, what happened next?

A: I read him his rights, and he decided to talk to us when we continued or started the interview.

Agent Salazar testified that during the subsequent interview Velarde–Gomez said that his reason for going to Mexico was to have a mechanic named Jose Meza help fix a battery charger problem in his recently purchased automobile, and that he dropped it off at 8:00 p.m. on January 22, 1999. While Velarde–Gomez initially told Agent Salazar that he picked up his automobile at midnight that night, Agent Salazar testified that he later changed his story, stating that he picked it up at 8:00 a.m. the following morning. When Agent Salazar confronted Velarde–Gomez with the inconsistency in his story, he had no response. Velarde–Gomez said he spent the time between dropping off and picking up the automobile at a restaurant in an area of Tijuana called Las Islas and going to a Tijuana club named Siete Copas. On cross-examination, Agent Salazar clarified that Velarde–Gomez also told him about meeting a prostitute at the club, going with her to a hotel, and spending $70 for the hotel and for her services. Agent Salazar also stated that Velarde–Gomez told him about going to a swap meet in Tijuana after picking up the automobile.

Velarde–Gomez later testified that he initially did not tell Agent Rodriguez about the prostitute at primary inspection because he was embarrassed and stated that he apparently did not explain himself very well during the interview with Agent Salazar. Velarde–Gomez explained that when he told Agent Salazar that he went to Mexico to get his automobile fixed, he meant that if it broke down while he was in Mexico, he would have someone fix it. He stated that he did not drop off his automobile at a mechanic shop but went to a restaurant called Las Islas around 6:30 or 7:00 p.m., that Jose Meza was a parking attendant there, that he told Jose that the automobile sometimes had a problem starting, and that Jose said if it would not start he would check out the problem. Velarde–Gomez said that he later went to a club called Siete Copas, met a woman there, spent 20 minutes talking with her in his automobile, and then went to a hotel with her, paying her to have sex with him. He testified that for a period of 15–20 minutes while he was taking a shower he was separated from her and that during

this time his automobile keys and business cards, which had the name and address of his employer in Hemet, were sitting open on the night stand. He also stated, however, that he never saw the woman leave the hotel room, and that in the morning his automobile keys were in the same place he put them before his shower. He left the woman the following morning and went to a swap meet the remainder of the day. Velarde–Gomez testified that Agent Salazar told him that he was telling lies during the interview; however, he said the agent never asked him to explain any inconsistencies in his story.

At the jury instruction conference, the government objected to two of Velarde–Gomez's proposed jury instructions, one relating to mere presence and the other to the defense theory of the case. Despite Velarde–Gomez's argument that the instructions should be given, the district court denied them. Later, after the approved instructions were read, Velarde–Gomez responded affirmatively when asked "whether the instructions were given properly."

During closing arguments, the government argued that Velarde–Gomez was chosen by a drug organization to bring drugs across the border because he was calm and would not tip off border inspectors. The government stressed that Velarde–Gomez was relaxed and unemotional:

> So now you have a defendant who you've learned was totally relaxed. When he came to the primary inspection area, he was relaxed. And then when he was interviewed by the case agents, he was relaxed when he was told that there was marijuana in the car. He showed no emotion. This defendant was perfect for the job. He's the kind of guy a drug organization would want to hire because he was able to sit there and show nothing.
>
> Now, if someone is told that they have no idea that there's marijuana in their car, if someone is told we've pulled you over, checked out your car, and we found 63 pounds of marijuana in your car, was he shocked? Was he surprised? Was he enraged? No. He showed no emotion at all. He was able to control any feelings he might have had. He was the perfect guy. He was the perfect guy to bring drugs across the border. He's the kind of guy a drug organization looks for and hires.

The government also addressed Velarde–Gomez's testimony, stating several times that the inconsistencies in his story were lies, that his testimony was a "silly story" and "ridiculous," and that he had five months between being arrested and testifying in court to fill the gaps in his story.

Velarde–Gomez's closing argument centered around his theory that, unbeknownst to him, someone took his car while he was in Tijuana and hid the marijuana in the gas tank.

The jury convicted Velarde–Gomez as charged. On appeal, Velarde–Gomez argues that: (1) the district court erred in allowing evidence of his post-arrest, pre-*Miranda* silence; (2) the government engaged in prosecutorial misconduct during closing arguments by suggesting the defense was a sham, stating Velarde–Gomez lied, and vouching for a government witness; (3) the district court erred in denying his proposed jury instructions on mere presence and theory of the case, thus impinging upon his Sixth Amendment right to present a defense; and (4) the district court erred in denying his motion to suppress incriminating statements taken in violation of Article 36 of the Convention. We address each of these arguments except the last, which was squarely rejected in *United States v. Lombera–Camorlinga*, 206 F.3d 882, 885–88 (9th Cir.2000) (en banc).

## II

█ Velarde–Gomez argues that the district court erred in allowing evidence of his post-arrest, pre-*Miranda* warning silence, thus violating his Fifth Amendment privilege against self incrimination. To preserve a constitutional issue for appeal,

one must make a specific, timely objection; otherwise, we can only review for plain error. *See United States v. Hutson,* 843 F.2d 1232, 1238 (9th Cir.1988). During Agent Salazar's testimony, when the government asked the agent what Velarde–Gomez's "response" was when accused of importing marijuana, Velarde–Gomez objected "based upon the previous thing we talked about." While this objection is facially vague, the government concedes that "the previous thing we talked about" was Velarde–Gomez's contention, made earlier, that evidence of his post-arrest, pre-*Miranda* warning silence and demeanor was inadmissible on Fifth Amendment grounds. We thus hold that Velarde–Gomez preserved this argument for appeal, and we review de novo whether references to Velarde–Gomez's silence and demeanor violated his Fifth Amendment privilege against self incrimination. *United States v. Soliz,* 129 F.3d 499, 503 (9th Cir.1997).

### A.

■ The Fifth Amendment states: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. The Supreme Court, in *Miranda v. Arizona,* stated that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also Dickerson v. United States,* — U.S. —, —, 120 S.Ct. 2326, 2335, 147 L.Ed.2d 405 (2000) ("*Miranda* requires procedures that will warn a suspect in custody of his right to remain silent and which will assure the suspect that the exercise of that right will be honored."), *citing Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. Consistent with *Miranda,* we have held that prosecutors may not use evidence of a defendant's post-arrest silence as substantive evidence of guilt. *Douglas v. Cupp,* 578 F.2d 266, 267 (9th Cir.1978). We have also held,

however, that comments on pre-arrest, pre-*Miranda* silence may be used as substantive evidence of guilt, *United States v. Oplinger,* 150 F.3d 1061, 1066–67 (9th Cir. 1998), as may post-arrest, post-*Miranda* silence if the defendant waives the right to remain silent and gives a statement. *United States v. Pino–Noriega,* 189 F.3d 1089, 1098 (9th Cir.1999).

Velarde–Gomez challenges the admission of testimony during the government's case that he was silent when Agent Salazar accused him of possessing and importing marijuana. The government concedes that Velarde–Gomez was in custody and had not received *Miranda* warnings at that time. Thus, this case involves comments on post-arrest, pre-*Miranda* silence and demeanor. Recognizing that our sister circuits are split on the issue, we recently held that use of a defendant's post-arrest, pre-*Miranda* silence for substantive proof of guilt "plainly infringed upon [the] privilege against self-incrimination." *United States v. Whitehead,* 200 F.3d 634, 639 (9th Cir.2000); *see also id.* at 638 (recognizing circuit split). The factual situation in *Whitehead,* however, is different than here: Whitehead remained silent throughout custody and did not waive his *Miranda* rights, *see id.* at 636–37 (stating that Whitehead remained silent post-custody), while Velarde–Gomez subsequently waived his right to remain silent and gave a statement to Agent Salazar. Without citing any supporting case law, the government attempts to distinguish *Whitehead* on this basis.

■ The relevant issue in determining whether the government may comment upon a defendant's silence, at least prior to a valid *Miranda* waiver, is whether the defendant is in custody. *Compare Oplinger,* 150 F.3d at 1066–67 (holding constitutional comment on pre-arrest silence), *with Whitehead,* 200 F.3d at 638–39 (holding unconstitutional comment on post-arrest silence). As we clarified in *Whitehead,* after one is in custody, "regardless whether the *Miranda* warnings were actually

given, comment on the defendant's exercise of his right to remain silent [i]s unconstitutional." *Id.* at 638 (citations omitted). If comment on a defendant's post-arrest silence is unconstitutional regardless whether *Miranda* warnings are actually given, it follows that comments on a defendant's invocation of silence up until the time that he actually waives the right to remain silent are also unconstitutional. The Seventh Circuit so held in *United States v. Hernandez,* 948 F.2d 316 (7th Cir.1991), *cited with approval in Whitehead,* 200 F.3d at 638, rejecting the same argument the government makes here:

> Nor can we accept the government's suggestion that there was no implication of guilt in the evidence of [the defendant's] momentary silence because the information was given in response to a preliminary question and because the jury was made aware that [the defendant] did make some statements after being read his *Miranda* rights.

*Id.* at 323. We thus hold that the district court erred in allowing comment on Velarde–Gomez's post-arrest, pre-*Miranda* silence, even though he subsequently waived his right to remain silent and gave a statement to customs agents.

### B.

■ The government concedes that it asked Agent Salazar during its case-in-chief whether Velarde–Gomez said anything when accused of marijuana importation and that the agent's answer was no. However, it argues that most of its other questions, as well as the entirety of its comments during closing arguments, related to Velarde–Gomez's demeanor as opposed to his silence. Velarde–Gomez argues that comments on Velarde–Gomez's demeanor were implicitly comments on his silence.

■ The privilege against self incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide ... evidence of a testimonial or communicative nature." *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The

Supreme Court has, however, "long held that the privilege does not protect a suspect from being compelled ... to produce 'real or physical evidence.'" *Pennsylvania v. Muniz,* 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), *quoting Schmerber,* 384 U.S. at 764, 86 S.Ct. 1826. "In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988). Thus, evidence of one's fingerprints, handwriting, vocal characteristics, stance, stride, gestures, or blood characteristics, *Schmerber,* 384 U.S. at 764, 86 S.Ct. 1826, as well as evidence of an intoxicated person's "slurring of speech and other evidence of lack of muscular coordination" does not violate the Fifth Amendment. *Muniz,* 496 U.S. at 592, 110 S.Ct. 2638; *see also id.* at 590–92, 110 S.Ct. 2638 (discussing other permissible evidence). Thus, evidence of one's physical characteristics is nontestimonial. *United States v. Wade,* 388 U.S. 218, 222, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). As Justice Holmes wrote for the Court long ago, "The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, *not an exclusion of his body as evidence when it may be material.*" *Holt v. United States,* 218 U.S. 245, 252–53, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (emphasis added).

We now focus only on that part of Agent Salazar's testimony that Velarde–Gomez had no physical response, i.e., he did not "look surprised or upset." During summation, the prosecutor stated that Velarde–Gomez was relaxed and unemotional. Like admissible evidence of gestures or muscular coordination, evidence of demeanor relates to physical characteristics, not efforts at communication. It describes one's mood rather than one's answers to questions. To quote Justice Holmes, it is use "of his body as evidence when it [is] material." *Id.* at 253, 31 S.Ct. 2. Pursu-

ant to *Schmerber* and its progeny, evidence of Velarde–Gomez's physical reactions and emotional state is evidence of his physical characteristics rather than communicative evidence. We hold that such evidence is not testimonial and thus its admission into evidence does not violate Velarde–Gomez's Fifth Amendment rights. *Cf. United States v. Schuler,* 813 F.2d 978, 981–82 (9th Cir.1987) (prosecutorial comments about a non-testifying defendant's *courtroom* behavior may violate the defendant's Fifth Amendment right not to testify).

Velarde–Gomez argues that the government used evidence of his demeanor as a proxy for silence. Of course, that is not the case: one's mood does not equate with one's statements. True, some nonverbal communication, such as the nod or shake of a head, may carry with it a "testimonial component whenever the conduct reflects the actor's communication of his thoughts to another." *Muniz,* 496 U.S. at 595 n. 9, 110 S.Ct. 2638 (citations omitted). There is simply no basis, however, for Velarde–Gomez's assertion that evidence that he was relaxed and unemotional was in some way testimonial in the same way as nodding one's head in answer to a question. Testimony of the former describes one's mood; testimony of the latter describes one's communicative responses.

### C.

■ We now turn to Velarde–Gomez's post-arrest, pre-*Miranda* silence, to determine whether the error in allowing Agent Salazar to testify that Velarde–Gomez did not speak when confronted with evidence of drug importation was harmless beyond a reasonable doubt. *United States v. Hasting,* 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (holding harmless error analysis applies to improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self–Incrimination Clause). The harmless error rule requires us to ask: "absent the prosecutor's allusion to the [defendant's silence], is it clear beyond a reasonable doubt that the jury would have returned a

verdict of guilty?" *Id.* at 510–11, 103 S.Ct. 1974.

■ Evidence pointing to Velarde–Gomez's guilt was strong. He was the driver, sole occupant, and owner of an automobile containing 63 pounds of marijuana with a $53,400 street value. We stated in *Whitehead,* in which the defendant was charged with the same crimes as Velarde–Gomez, that such "physical evidence was virtually conclusive of guilt." *Whitehead,* 200 F.3d at 639 (holding Fifth Amendment error not to be prejudicial under plain error review). We recognize that *Whitehead* applied the plain error standard of review rather than the harmless error beyond a reasonable doubt standard that we must use. The two approaches, however, "require[ ] the same kind of inquiry," even though the burden of proof in harmless error beyond a reasonable doubt cases falls upon the government—as opposed to plain error cases, in which it falls upon the defendant. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

In addition to compelling physical evidence, there was more here: Velarde–Gomez made inconsistent statements upon which a jury could also rely to reach a guilty verdict. *United States v. Hursh,* 217 F.3d 761, 768 (9th Cir.2000). For instance, even though Velarde–Gomez initially said he went to Mexico for the day to visit friends and drink, Agent Salazar testified that he later stated that he went to Mexico the day before and that his purpose was to get his recently purchased automobile fixed. Also, he first told Agent Salazar that he picked up his automobile from the mechanic at midnight, but later said it was 8:00 a.m. the following morning. The inconsistent statements, together with sole possession of a substantial amount of marijuana, are substantial evidence that leads us to conclude beyond a reasonable doubt that the jury would have convicted Velarde–Gomez even absent comments upon his post-arrest, pre *Miranda* silence. *Hasting,* 461 U.S. at 510, 103 S.Ct. 1974.

### III

■ Velarde–Gomez next argues that the government committed misconduct during argument to the jury by: (1)

vouching for a government witness; (2) denigrating the defense as a sham; and (3) calling him a liar. Because Velarde–Gomez did not object at trial to the comments made in the prosecutor's argument, we review for plain error. *United States v. Kessi,* 868 F.2d 1097, 1107 (9th Cir.1989). "In order to constitute 'plain error,' the error must be 'plain' or clear on its face under current law and must affect a substantial right." *United States v. Campos,* 217 F.3d 707, 712–13 (9th Cir.2000), *citing Olano,* 507 U.S. at 732–34, 113 S.Ct. 1770.

The prosecution is allowed "a degree of latitude in the presentation of their closing summations," including "the freedom to strike hard blows based on the evidence and all fair inferences therefrom." *United States v. Prantil,* 764 F.2d 548, 555 (9th Cir.1985) (internal citations and quotations omitted). However, it may not resort to foul blows. *Id.* There is no reversible error unless misconduct in the summation was "so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Birges,* 723 F.2d 666, 672 (9th Cir.1984) (internal citations and quotation omitted). The government's attorney delivered a strongly worded argument; the question is whether she delivered hard blows or foul ones.

### A.

We first examine whether the government committed plain error by vouching. During Velarde–Gomez's summation, he challenged the accuracy of the report Agent Salazar wrote after interviewing Velarde–Gomez. During rebuttal argument, the government conceded that the report contained one minor inaccuracy (the Spanish word for sixty rather than seventy), but said "everything else was accurate." The government attorney pointed to other evidence corroborating the report, and never asserted her personal belief that the report was truthful.

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir.1993) (citations omitted). Whether vouching occurred depends upon several factors, including:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall. When reviewing for plain error, we then balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case.

*Id.* at 1278.

After reviewing the statement in light of these factors, we conclude that the government did not vouch, much less commit plain error. It put the weight of admitted evidence, not the government's prestige, behind the comment. There was no implication that the government attorney had a personal belief or extra-record knowledge of the accuracy of the report, or that the government or court had monitored Agent Salazar's testimony for truthfulness. And while there was no curative instruction given, this brief comment was, when weighed against the strong evidence against Velarde–Gomez previously discussed, virtually inconsequential.

### B.

We next address whether plain error occurred in the government's alleged denigration of Velarde–Gomez's defense as a sham during its arguments. Velarde–Gomez contends that the government committed misconduct by emphasizing that he had time between his arrest and his in-

court testimony to make up or fill the gaps in his story. However, the Supreme Court recently held that similar comments do not violate a defendant's Fifth or Sixth Amendment rights and are a proper way to impeach the defendant's testimony, *Portuondo v. Agard*, —— U.S. ——, —— ——, 120 S.Ct. 1119, 1123–27, 146 L.Ed.2d 47 (2000), and we recently held that such comments do not constitute prosecutorial misconduct. *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir.2000).

▮ Velarde–Gomez also argues that his defense was denigrated by the government's repeated statements during argument that his testimony was a "silly story" and "ridiculous." We have held it to be misconduct to call the defense a "sham" or "scam" directly. *United States v. Sanchez*, 176 F.3d 1214, 1224–25 (9th Cir. 1999). It is not misconduct, however, to use less derogatory language to comment on the plausibility of a defendant's testimony. *Birges*, 723 F.2d at 671 & n. 2, 672 (holding not misconduct to call defendant's testimony "fabricated" and "figment[ ] of . . . imagination"). We hold that there was no plain error in calling Velarde–Gomez's story "silly" and "ridiculous," because such mild comments relate to the truth of Velarde–Gomez's testimony without directly belittling him or his defense.

### C.

▮ We next examine whether the government's calling Velarde–Gomez's story a "lie" was misconduct constituting plain error. During opening and rebuttal arguments, the government used some derivative of the word "lie" to describe Velarde–Gomez's story at least eight times. We have held, however, that it "is neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who was taken the stand." *Id.* at 672; *see also Cabrera*, 201 F.3d at 1250; *United States v. Laurins*, 857 F.2d 529, 538–40 (9th Cir.1988) (reviewing for plain error). Prosecutors may "argue reasonable inferences based on the evidence," including, in a case turning on "which of two conflicting stories is true . . ., that one

of the two sides is lying." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991). There is thus no prejudice merely from using a derivative of the word "lie" in summation; to show misconduct, the defendant must establish that the prosecutor's use of the word "lie" was not founded upon a reasonable inference from the evidence. *Laurins*, 857 F.2d at 539. Reviewing for plain error, we look to the statements made "in the entire context of the trial," *Cabrera*, 201 F.3d at 1246, including the strength of the evidence suggesting guilt, *Laurins*, 857 F.2d at 539, and the neutralizing effect of the jury instructions. *United States v. Bracy*, 67 F.3d 1421, 1431 (9th Cir.1995).

In *Laurins*, we held that it was not plain error for a prosecutor to repeatedly call the defendant's story a "lie," "falsity," "fraud," and "deceit." 857 F.2d at 539 & n. 2. Like *Laurins*, the government's comments, read in the context of the surrounding argument, reveal that she was permissibly arguing a reasonable inference from the facts by showing that Velarde–Gomez's statements were inconsistent. *Molina*, 934 F.2d at 1445; *Laurins*, 857 F.2d at 539. The prosecutor set out the evidence presented and argued the government's position—that the inconsistencies in Velarde–Gomez's story support the inference that he was dishonest. As recounted above, the evidence against Velarde–Gomez was strong. Further, any prejudice to the jury that arose from saying "lie" and "lied" was neutralized by the prosecutor's reminder that credibility was for the jury to decide, a reminder that was emphasized shortly thereafter in the jury instructions, along with an instruction that attorney argument is not evidence. We therefore conclude that the comments were not plain error. *Laurins*, 857 F.2d at 539.

### IV

▮ Velarde–Gomez also contends that the district court erred in denying his jury instructions on theory of the defense

and mere presence. We typically review "whether the district court's instructions adequately presented the defendant's theory of the case de novo." *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir.2000). The government, however, argues that we should review for plain error because, despite that Velarde–Gomez proposed these instructions and argued at the jury instruction conference that they be given, he did not specifically and formally object that they were not given and responded affirmatively in court when asked whether the instructions were properly given.

■■■ To preserve the right to appeal a district court's failure to give a jury instruction, one must offer "a formal, timely, and distinctly stated objection" pursuant to Federal Rule of Criminal Procedure 30. *Kessi*, 868 F.2d at 1102. The sole exception to this requirement is when "doing so would be a 'pointless formality' [meaning] (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." *Id.* (citations omitted).

■■■ Despite that Velarde–Gomez did not object to the district court's failure to give mere presence and theory of the case instructions at the time the district judge instructed the jury, objection would have been a pointless formality. Velarde–Gomez consistently argued that the jury should not convict him because (1) he was tricked into driving an automobile with marijuana in it across the border and (2) the government's only link between him and the crime was his presence in the automobile. He proposed mere presence and theory of the case instructions before trial began. At the jury instruction conference, he made it clear to the court why the instructions should be given. Under these circumstances, it would have been pointless for Velarde–Gomez to object formally. We thus review the district court's failure to give these instructions de novo. *Dixon*, 201 F.3d at 1230. "If the district

court's instructions fairly and adequately covered the elements of the offense, however, we review the instruction's 'precise formulation' for an abuse of discretion." *Id.*

## A.

■■■ We first address whether the district court should have given Velarde–Gomez's mere presence instruction, which stated:

> Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that the defendant committed the crimes of importation of marijuana and possession of marijuana with the intent to distribute it, unless you find that the defendant was a participant and not merely a knowing spectator. The defendant's presence may be considered by the jury along with other evidence in the case.

■■■ A mere presence instruction is unnecessary if "the government's case is based on more than just a defendant's presence, and the jury is properly instructed on all elements of the crime." *United States v. Negrete–Gonzales*, 966 F.2d 1277, 1282 (9th Cir.1992); *see also United States v. Medrano*, 5 F.3d 1214, 1218–19 (9th Cir.1993). The appropriateness of the instruction thus depends upon what the government proved about the defendant's alleged involvement in the crime: "In other words, a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking." *United States v. Echeverri*, 982 F.2d 675, 678 (1st Cir.1993).

■■■ There is no question that the district court properly instructed the jury on the elements of the crimes for which Velarde–Gomez was charged. An importation of marijuana conviction must be based upon jury findings that the defendant knowingly or intentionally imported marijuana. *United States v. Mayes*, 524 F.2d 803, 807 (9th Cir.1975). Similarly, a possession of marijuana with intent to distribute violation requires findings that the

defendant knowingly possessed marijuana with intent to distribute. *United States v. Cain,* 130 F.3d 381, 382 (9th Cir.1997). The jury instructions correctly stated these elements.

■ Thus, the dispositive question becomes whether the government's case rested upon more than mere presence. In attempting to prove its case, the government was entitled to rely upon circumstantial evidence and inferences that the jury could draw therefrom. *United States v. Lewis,* 787 F.2d 1318, 1323 (9th Cir.) ("Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."), *amended on other grounds,* 798 F.2d 1250 (9th Cir.1986). As stated earlier, evidence that a defendant made inconsistent statements is circumstantial evidence that he had knowledge that he was importing or possessing marijuana. *Hursh,* 217 F.3d at 768. Because the government introduced evidence that Velarde–Gomez made inconsistent statements, its case rested upon more than his mere presence.

In *Negrete–Gonzales,* we held that a mere presence instruction should have been given. 966 F.2d at 1282. In that case, the government's primary evidence was that the defendant accompanied the principal to a drug sale. *Id.* Here, Velarde–Gomez's presence was not mere: rather than coming along for the ride, he was the driver and sole occupant of the automobile in which 63 pounds of marijuana was found. Thus, the district court did not err in refusing Velarde–Gomez's mere presence instruction.

### B.

■ We now turn to whether Velarde–Gomez was entitled to his theory-of-the-case instruction, which stated:

Mr. Velarde–Gomez's theory of the case is that he was unknowingly tricked into driving the vehicle containing marijuana, and because he was unaware of the marijuana's presence and had no criminal intent, he is not guilty.

Mr. Velarde Gomez does not have to prove that he is not guilty, nor does he bear the burden of having to prove any fact in this case. If the prosecution fails to prove beyond a reasonable doubt that Mr. Velarde–Gomez knew that the marijuana (or some prohibited drug) was hidden in the vehicle, you must return a not guilty verdict.

■ As a general matter, a district court may refuse to give a jury instruction "if its language gives undue emphasis to defendant's version of the facts rather than being a statement of appropriate principles of [the] law for the jury to apply to the facts." *United States v. Goland,* 959 F.2d 1449, 1453 (9th Cir.1992) (internal quotation omitted). Pursuant to this rule, the first paragraph of Velarde–Gomez's requested instruction was not entitled to be read to the jury. Rather than elucidate relevant legal principles for the jury to apply, the paragraph merely states Velarde–Gomez's version of the facts. The appropriate place to argue the facts is in closing arguments, and the record reflects that Velarde–Gomez's counsel fully outlined the facts that supported the "unknowingly tricked" theory during his closing argument.

Thus, because the first paragraph of the proposed instruction was infirm, the instruction became erroneous. The district court thus did not err in rejecting the proposed instruction.

AFFIRMED.