In re Jerry Aldean HURLEY, Phyllis Marie Hurley, Debtors.

Jerry Aldean Hurley, Phyllis Marie Hurley, Plaintiffs,

v.

Student Loan Acquisition Authority of Arizona; Unipac Service Corporation, United Student Aid Funds, Inc.; and Southwest Student Services Corp.; and Al Collins Graphic Design School, Defendants.

Bankruptcy No. 99–41267–7.
Adversary No. 00/00048.

United States Bankruptcy Court,
D. Montana,
Butte Division.

Jan. 31, 2001.

16

Gary S. Deschenes, Deschenes Law Office, Great Falls, MT, for debtors/plaintiffs.

Alan C. Bryan, Crowley, Haughey, Hanson, Toole & Dietrich P.L.L.P., Billings, MT, for defendant Educational Credit Management Corporation.

## ORDER

RALPH KIRSCHER, Bankruptcy Judge.

Plaintiffs/Debtors Jerry Aldean Hurley ("Jerry") and Phyllis Marie Hurley ("Phyllis"), commenced this adversary proceeding on June 22, 2000, seeking a determination that various educational loans owing by Plaintiffs to the Defendants are dischargeable on grounds of undue hardship under 11 U.S.C. § 523(a)(8). On October 13, 2000, after notice and a hearing and without opposition, the Court entered an Order and Judgment in Jerry's favor discharging all of his student loan debts listed in the Complaint, leaving for trial the dischargeability of the student loan debt owed by Phyllis alone. After due notice, trial of Phyllis' § 523(a)(8) claim for relief was held at Great Falls on November 9, 2000. Plaintiff Phyllis Hurley was represented by attorney Gary S. Deschenes. Attorney Alan C. Bryan ("Bryan") appeared on behalf of the Defendant Educational Credit Management Corporation ("ECMC")[1]. No other Defendant appeared.[2] Physical therapist Debra Ammondson ("Ammondson") also testified. Plaintiff's Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, and 8 were admitted into evidence by stipulation, as were Defendant's Ex. A, B, C, D, E[3], and F. At the close of the trial the Court took the matter under advisement and granted the parties time in which to submit briefs. ECMC requested and the Court granted an extension of time to file its brief, which it filed on November 22, 2000. Phyllis has not filed a brief. Notwithstanding, this matter is ready for decision.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding to determine dischargeability of particular debts under 28 U.S.C. § 157(b)(2)(I). This Order contains the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052. For the reasons set forth below, Judgment shall be entered in favor

---

1. ECMC filed an answer to Plaintiffs' complaint on July 19, 2000, averring that Phyllis is indebted to ECMC for the balance due under student loan promissory notes transferred to ECMC from Defendant United Student Aid Finds, Inc. Ex. C.

2. The United States Department of Education ("DOE") filed a motion to dismiss on July 31, 2000, asserting that it has no interest in this matter. The Court dismissed the DOE by Order entered July 31, 2000.

3. E consists of medical records for Phyllis submitted by ECMC, which the Court consolidated with medical records submitted by Phyllis, Ex. 4.

of the Plaintiff Phyllis Hurley discharging her educational loan debts owed to the Defendants pursuant to 11 U.S.C. § 523(a)(8), since excepting such debts from her discharge would impose an undue hardship on her.

## FACTS

Phyllis is 60 years old and in poor health. Her health problems includes: asthma; Class 2 diabetes; heart problems; hypertension; and peripheral vascular disease. Ex. 4/E. Her health history includes recent recurrent pneumonia, diverticulitis, rheumatic fever, hepatitis, urinary tract infections, and lactose deficiency. Ex. 4/E. For years Phyllis smoked two packs of cigarettes per day, but has quit. She has no medical insurance or government benefits, although she has applied for social security disability. Transcript ("Tr."), pp. 51, 57. Her spouse and co-Debtor Jerry Aldean Hurley ("Jerry") receives medical benefits through the Veteran's Administration ("V.A."). Currently, Phyllis cannot afford to pay for all her needed medications, or to see her doctor more often than every six months. Tr. pp. 52–53. Her doctor provides her with free samples of some of her medications. Tr. pp. 52–53.

Years ago Phyllis earned a bachelor's degree in history with a minor in art from Northern Montana College in Havre. She married Jerry, and was employed at various times in Havre and Great Falls as a motel night clerk, receptionist and tour guide for "Havre Beneath the Streets", and in apartment management and cleaning for Tenco/Parkview Apartments in Havre. Tr. pp. 54–56.

Phyllis began incurring the student loan debt at issue in this adversary proceeding in 1991. The Montana Job Service suggested to her that she attend the Al Collins School of Graphic Design ("Al Collins School") to learn graphic design. Tr. pp. 37, 60. Phyllis applied for and received several federal student loans. ECMC's Ex. A consists of six (6) applications and promissory notes for Stafford Loans to finance her attendance at the Al Collins School in Tempe, Arizona, in 1991, 1992, and 1993. She graduated in July of 1993 [4] with an associate's degree in advertising. Tr. p. 60.

Phyllis has not used her associate's degree from the Al Collins School in her career [5]. She has not received any job leads based upon her associate's degree, and has never worked in the field of advertising or graphic design. Tr. pp. 46–47. There is no job market for Phyllis in her degree of study in the Havre/Great Falls area, where Phyllis returned because her parents are both in their eighties and in poor health.[6] Tr. pp. 59–60.

Phyllis has made no payments on her student loans. Tr. p. 59. She applied for and was granted several forbearances and deferments in 1994, 1995, 1996, and 1997, due to inadequate income and part-time employment. Tr. pp. 45–46, 59; Ex. B.

On May 13, 1999, Phyllis and Jerry filed their Chapter 7 bankruptcy petition, Schedules, and Statements in Case No. 99–41267-7. Of their total liabilities listed of

---

4. ECMC's exhibits are contradictory on her graduation date. Her answer to interrogatory no. 14(e) states she attended from October 1, 1990, and graduated December 4, 1992. Ex. E. Ex. A, the applications and promissory notes, include estimated graduation dates in both 1992 and 1993, and two of the applications were not completed until 1993, when she listed her address in Mesa, Arizona.

5. The Al Collins School trained Phyllis in the use of graphic design equipment, and told her that she would earn $30 per hour. However, when she left the school she learned that the equipment existed only at three places. Tr. p. 46. The actual course work offered by the Al Collins School appears of dubious value. For example, in the "marketing" course Phyllis took "the instructor showed films of 'Batman' the whole class." Tr. p. 60.

6. Her father is 86, is blind, has a heart condition identical to Phyllis and lives day to day. Her mother is 82, has suffered a stroke, has diabetes and is blind.

$88,645.53, the largest category of claims consists of student loan debt, followed by medical bills. Ex. D, Schedule F. At the time they filed their petition both Plaintiffs had been employed for a year by Sandstone, LPD, a limited partnership which owned a low-income housing protect consisting of four buildings of three floors each. Tr. pp. 38, 43–44; Ex. D, 6, Schedule I. Debtors were co-managers of the project and each were paid a gross salary of $600 per month, which after deductions resulted in net monthly income of $1,055.84. Schedule I; Ex. D, 6. They lived on the property and received rent and utilities, other than telephone, free of charge. Tr. pp. 40, 50; Ex. D, 6. Schedule J lists their total monthly expenses as $1,937, with $1,000 the largest entry listed for food because of their dietary restrictions.[7] Tr. p. 41; Ex. D, 6.

Plaintiffs filed their adversary complaint to determine the dischargeability of their student loan debts on June 22, 2000. On July 28, 2000, Defendant United Student Aid Funds, Inc. assigned its rights to certain student loans to ECMC, including $30,009.58 owed by Phyllis in principal, interest and fees. Ex. C.

As co-managers at Sandstone, the Plaintiffs divided the labor between them. Jerry did the repair work, and Phyllis did the cleaning. Tr. pp. 43–44. The buildings at Sandstone do not have elevators, and Phyllis became unable to perform her cleaning duties due to her health problems. She did not have the money to buy medications which her doctor prescribed for her diabetes. Tr. p. 36. Without the medicines she became ill with complications from diabetes and pneumonia and could not clean the hallways or apartments.

On September 27, and 28, 2000, her doctor, Dr. Legan, referred her to Ammondson to undergo a test known as a "Functional Capacity Evaluation" ("FCE")

because of her respiratory problems. Ex. 8. The test was initially delayed because Phyllis was having difficulty breathing, but by the time of the functional capacity evaluation Phyllis said she was well. Tr. p. 24. Dr. Legan, who examined Phyllis on September 26, 2000, gave Ammondson clearance to proceed with the FCE. Tr. pp. 29–30; Ex. 4/E.

Ammondson is supervisor of Outpatient Physical Therapy, Occupational Therapy and Speech Pathology Services at Benefis Healthcare in Great Falls. She has a master's degree in occupational therapy and has worked in her field for 22 years. Ammondson conducted the FCE on Phyllis to determine if she was physically able to continue her employment as a housekeeper given her respiratory problems. Tr. pp. 18–19. Ex. 8, the FCE Summary Report, was admitted into evidence by stipulation. In Ex. 8 Ammondson concludes that Phyllis was cooperative and gave maximum consistent effort throughout the FCE. Despite Phyllis' efforts, Ammondson concluded that Phyllis "would be currently unable to complete those activities as described, due to decreased aroebic [sic] activity and [de]conditioning." Ex. 8, p. 3; Tr. pp. 14–15.

Specifically, Ammondson concluded that Phyllis could not meet such critical job demands for a housekeeping job as climbing stairs with equipment, lifting and carrying up to 25 pounds, climbing ladders and step stools, and kneeling or squatting to clean floors and below sinks. Ex. 8, p. 3. Phyllis was unable even to complete much of the FCE because of physical problems. Tr. p. 13. Her blood pressure and heart rate increased beyond allowable standards to the point Ammondson terminated the tests. Tr. p. 15. At trial Ammondson testified she saw no evidence that Phyllis had improved. Tr. p. 32. Having observed Ammondson's demeanor while

---

7. Phyllis cannot eat dairy products. Neither Phyllis nor Jerry can eat sugar. Phyllis cannot eat salt. Each of them has to eat four meals per day. As a result, Plaintiffs must purchase sugar-free, low-sodium and dairy-free products which cost more than ordinary products. Tr. pp. 41–42.

testifying under oath and subject to cross examination, the Court finds that Ammondson is a credible witness. *In re Taylor,* 514 F.2d 1370, 1373–74 (9th Cir.1975); *see also, Casey v. Kasal,* 223 B.R. 879, 886 (E.D.Pa.1998).

On October 14, 2000, by mutual agreement Phyllis terminated her employment at Sandstone. Tr. pp. 37, 39. She continues to live there with Jerry, who is still employed at Sandstone. Tr. pp. 39–41. Jerry has been earning slightly more since Phyllis left Sandstone's employ, earning $800 in October of 2000, but in return he is expected to perform the cleaning Phyllis previously performed. Tr. p. 44. His future employment, and Plaintiffs' continued rent-free tenancy at Sandstone, has not been resolved with management. Tr. pp. 40–41.

## DISCUSSION

At the time Debtors filed their voluntary Chapter 7 bankruptcy petition on May 13, 1999, 11 U.S.C. § 523(a) had been amended to read as follows:

(a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

■ The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *Albert v. Ohio Student Loan Comm'n (In re Albert),* 25 B.R. 98 (Bankr.N.D.Ohio 1982); *United States v. Brown (In re Brown),* 18 B.R. 219 (Bankr.

Kan.1982); *Garmerian v. Rhode Island Higher Educ. Assistance Auth. (In re Garmerian),* 81 B.R. 4 (Bankr.R.I.1987). As the court in *Brown* noted:

It seems universally accepted, however, that "undue hardship" contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.

*Brown,* 18 B.R. at 222. In addition:

[A] loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to maintain himself and his dependents and to repay the educational debt.

*Report of the Commission of the Bankruptcy Laws of the United States,* House Doc. No. 93–137, Part I, 93rd Cong., 1st Sess. (1973) at 140, n. 14 and 15, reprinted in COLLIER ON BANKRUPTCY, Appendix 2 at PI-i. In this case the record shows that Phyllis' student loans, which she incurred beginning when she was 50 years old, have not enabled her to earn any income, let alone "substantially greater income over" her working life. She has never used her commercial design degree in her employment, never received a job lead from the Al Collins School, and last worked as a cleaning person for the Sandstone low-income housing project.

■ In a complaint to determine the dischargeability of student loan debt, a debtor has the burden of proof to show evidence of undue hardship sufficient to discharge the debt. *In re Pederson,* 18 Mont.B.R. 429, 434 (Bankr.Mont.2000), *In re Thomsen,* 17 Mont. 493, 499, 234 B.R. 506, 510 (Bankr.Mont.1999); *Healey v. Massachusetts Higher Educ. (In re Healey),* 161 B.R. 389, 393 (E.D.Mich.1993); *Rose v. United Student Aids Funds MT (In re Rose),* 6 Mont.B.R. 462, 464 (Bankr. Mont.1988); *Connecticut Student Loan*

*Found. v. Keenan (In re Keenan)*, 53 B.R. 913 (Bankr.Conn.1985).

Courts have identified several factors and tests to consider when determining whether "undue hardship" exists in a particular case. Since enactment of the Bankruptcy Code, the United States Court of Appeals for the Second Circuit adopted a test for determining "undue hardship" in the educational loan context. *Brunner v. New York State Higher Educ. Services Corp. ("Brunner")*, 831 F.2d 395, 396 (2nd Cir.1987). *But see, Pennsylvania Higher Educ. Assistance Agency v. Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979) (Prior to the adoption of the Bankruptcy Code, the bankruptcy court for the Eastern District of Pennsylvania propounded a different and oft-cited three-prong undue hardship test.). According to the Second Circuit in *Brunner*, in order to gain discharge under 11 U.S.C. § 523(a)(8)(B), a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* In 1998, the Ninth Circuit Court of Appeals adopted the *Brunner* test as the appropriate test for determining what constitutes undue hardship under 11 U.S.C. § 523(a)(8)(B). *United Student Aid Funds v. Pena ("Pena")*, 155 F.3d 1108, 1114 (9th Cir.1998) ("We adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to discharge student loans in bankruptcy pursuant to 11 U.S.C. § 523(a)(8)(B)"). In *Pena*, the Court summarized the *Brunner* test as thus:

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. The court noted that this portion of the test "comports with common sense" and had already "been applied frequently as the minimum necessary to establish 'undue hardship.' " *Id.* (citing *In re Bryant*, 72 B.R. 913, 915 (Bankr.E.D.Pa.1987)).

Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.*

The third prong requires "that the debtor has made good faith efforts to repay the loans...." *Brunner*, 831 F.2d at 396. The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). *Brunner*, 46 B.R. at 754–55. Section 523(a)(8) was a response to "a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts.' " *Id.*, (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93–137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14). This section was intended to "forestall students ... from abusing the bankruptcy system." *Id.*

*Pena* at 1111. This Court, in *In re House*, 17 Mont.B.R. 321, 336 (Bankr.Mont.1999), followed the directive of the *Pena* Court by utilizing the three-prong *Brunner* test, which test is also applicable in the instant case.

In the case *sub judice*, ECMC contends that Phyllis has not satisfied the first two prongs of the *Brunner* test, but concedes she "has shown good faith as defined under the third prong of the *Brunner* test by

applying for, and receiving, forbearance and deferment of payment agreements due to her inability to make payments on her loans from graduation until she filed for bankruptcy." ECMC Post–Trial Brief, p. 7. Thus, only the first two prongs are at issue. As discussed below, the Court concludes that Phyllis has satisfied her burden of proof under the first two prongs of the *Brunner* test by a preponderance of the evidence.

### I. First Prong.

As set forth above, the *Brunner* analysis starts with an examination of whether the Debtor can maintain a minimal standard of living and still repay her student loan obligations. The evidence in the record is overwhelming that Phyllis cannot maintain a minimal standard of living and repay her student loans. On her petition date she was employed at Sandstone and earned $600 per month plus free rent and utilities. Even then, her income combined with her spouse's income totaled $1,055.84 and was almost $900 per month less than their monthly expenses. Ex. 6, D— Schedules I and J. ECMC argues that it is impossible to determine her monthly expenses, but ECMC itself offered Plaintiffs' Schedules and Statements into evidence as its Ex. D.

Since their petition date Phyllis lost her job with Sandstone, her only source of income. ECMC suggests that Jerry can take on her duties and income, but Phyllis testified that Jerry was paid $800 in October, which is less than a $300 increase and does not make up for the loss of Phyllis' $600 salary. Tr. p. 44. The Court observed Phyllis' demeanor while testifying under oath and cross-examination, and finds that Phyllis is a credible witness. *In re Taylor*, 514 F.2d at 1373–74; *Casey v. Kasal*, 223 B.R. at 886.

Jerry's increased take home pay does not make up the Plaintiffs' monthly deficit shown by Schedules I and J, or even for the loss of Phyllis' income. Moreover, the evidence suggests that such increase may only be temporary. If Jerry's employment at Sandstone ends, Plaintiffs' expenses would increase significantly to provide for rent and utilities. The record shows that Phyllis is unable to visit her doctor more often than approximately every six months, and does not have sufficient income or assets to buy medicines Dr. Legan prescribes. Instead, she relies on his office for free samples of drugs. Tr. pp. 52–53.

The evidence in the record is overwhelming that Phyllis cannot maintain a minimal standard of living and still repay her student loan obligations. Ex. C shows she owes student loans, interest and fees in the total amount of $30,009.58 now held by ECMC. Ex. A shows interest on such loans at variable rates ranging from eight to twelve percent (8–12%). Applying a simple 10% interest rate on the balance shows Phyllis would have to pay $3,000 per year, or almost $250 per month, just to pay the annual interest on her student loan debt, with nothing paid on the principal.

Phyllis is now 60 years old, and has never earned any income as a result of her associate's degree in advertising. ECMC argues "[i]t is as likely as not that Hurley has disposable income which could be used toward the payment of her student loans." The Court disagrees, and finds the evidence shows Phyllis has no disposable income and is unlikely ever to be able to repay her educational loan debts and maintain a minimal standard of living. ECMC contends that inconsistencies in Debtors' expenses listed in their Schedule J, answers to discovery responses and testimony make it impossible to determine what her monthly expenses are. While it may be impossible to arrive at an exact figure for Plaintiffs' expenses, the Court is confident in its conclusion that Phyllis and Jerry live at a monthly deficit, due in large part to their high medical and dietary expenses.

ECMC contends that Phyllis eats dry breakfast cereal each morning, which is

"relatively inexpensive and can last several days or even a week." ECMC offered no evidence to support this argument involving the expense or longevity of cereal, and an attorney's argument is not evidence. *United States v. Velarde–Gomez*, 224 F.3d 1062, 1073 (9th Cir.2000). Phyllis testified that their high monthly food expense is due to the fact they are required to purchase higher-priced foods for their diabetic, low-sodium, dairy-free diet. Tr. pp. 40–41. She does not live on breakfast cereal alone, and the uncontroverted evidence supports her high food expense.

The first prong of the *Brunner* test requires simply that the Debtor show she cannot repay her student loans and maintain a minimal standard of living. *Pena*, 155 F.3d at 1111. This prong "comports with common sense". *Id.; Brunner*, 831 F.2d at 396; *In re Pederson*, 18 Mont.B.R. at 438. Applying this common sense standard to the evidence, the Court concludes Phyllis has satisfied her burden of proof under the first prong by a preponderance of the evidence. Phyllis was, is, and, in all likelihood, will be unable to earn sufficient money to cover her medical and living expenses in the future. The evidence shows she cannot repay her student loans and maintain a minimal standard of living.

**II. Second Prong.**

To satisfy the second prong of the *Brunner* test Debtor must prove that her state of affairs is likely· to persist for a significant portion of the repayment period of the student loans. *Pena*, 155 F.3d at 1111, *Brunner*, 831 F.2d at 396; *Pederson*, 18 Mont.B.R. at 439. ECMC argues that Phyllis has failed her burden of proof under the second prong because the results of her FCE were skewed, and because she failed to show she is unable to do other work, or that her present condition will continue for a significant portion of the

repayment period, or that her situation is hopeless.

The Court finds that the record does not support ECMC's contentions. ECMC must take the Debtor as it finds her. From the evidence, Ex. 4/E, no dispute exists from her medical records that Phyllis suffers from serious and permanent health problems discussed above, including diabetes, heart problems, asthma, and recurrent pneumonia. In fact, ECMC argues that her FCE was skewed, in part [8], as a result of her suffering from a diabetic coma on the day prior to the test. ECMC does not contend that the health problems of this 60 year old Debtor will not persist.

ECMC suggests Phyllis is eligible for government benefits which could help her repay her student loans, but the record shows she does not receive any. Phyllis has applied for governmental benefits such as social security disability and is willing to apply for food stamps if eligible, but no evidence exists that she will be awarded any such benefits, and the Court will not engage in speculation about future benefits.

The evidence shows Phyllis is unable to perform the tasks required for her previous employment at Sandstone. In fact, that employment ended because of her inability to physically perform the required cleaning duties. Ex. 8, the FEC performed on her by Ammondson, supports Phyllis' position that she is unable to perform the job duties as housekeeper, and Ammondson testified that it would be difficult for Phyllis to resume such employment. Tr. pp. 13–14, 15–16.

ECMC argues that the methodology and conclusions in the FEC, Ex. 8, are skewed. While cross-examining Ammondson, ECMC's attorney Bryan referred to "Taber's Encyclopedia and Medical Dictionary" (hereinafter "Taber's") for the normal ranges of blood sugar in a type II

---

**8.** Residual effects from pneumonia, which Phyllis suffered in early September 2000, may also have skewed the results.

diabetic and for blood pressure. Tr. p. 22, 25–27, 28–29. ECMC argues that Ammondson's conclusions in Ex. 8 are skewed because of residual effects of flu and pneumonia, possible diabetic coma, and Phyllis' high blood pressure when the test was administered to her.

■ Views of recognized authorities expressed in treatises such as Taber's may be employed on cross examination of an expert witness to impeach, provided the author's competency is established by admission of the expert witness, by other expert testimony, or by judicial notice. Barry Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 803.30; *see also* 5 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 803.23[1] (2nd ed.2000) (statements from published treatises … may be read into evidence as hearsay exceptions if they have been "established as a reliable authority by expert testimony or by judicial notice.")

■ In the instant case, Ammondson acknowledged Taber's as a reliable authority, the Debtor did not object to its admission and the Court took notice of Taber's Encyclopedia and Medical Dictionary. However, the fact that the excerpts from Taber's were admitted is not conclusive or the end of the matter. For one thing, as "gatekeeper" the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993); *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir.1997), *cert. denied*, 521 U.S. 1127, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997); Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 104.1. Even more important in the instant case, the determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact— which in a bench trial such as this adversary proceeding is this Court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mutual Insurance Co. v.*

*Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir.1997); Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2; *see also*, 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 702.05[2][a] (2nd ed.2000).

In determining the weight to be given to the excerpts from the Taber's medical dictionary, the Court compares the general medical definitions and normal ranges which Bryan read from Taber's with Ammondson's testimony and Phyllis' medical records, Ex. 4/E. Ammondson has a master's degree and 22 years of experience in occupational therapy. Ammondson conducted the FCE of Phyllis after her doctor, who examined her the day before the FCE on September 26, 2000, according to Ex. E, physically cleared Phyllis to take the test. Tr. pp. 24, 29.

Ammondson conducted the FCE for as long as Phyllis could stay within the parameters of heart rate and blood pressure, and when those were exceeded she stopped the tests. Ammondson testified that Phyllis' lung problems and residual flu would have at most a minor impact on the evaluation and that her overall physical conditioning was not changed significantly by such factors. Tr. pp. 23–24.

ECMC did not conduct its own physical examination of Phyllis, and did not call its own expert witness to refute Ammondson's conclusions or to question her methodology in conducting the FCE, or to support ECMC's argument that the results of the FCE were significantly skewed by Phyllis' lung problems, flu, diabetic coma, high blood pressure, excessive heart rate, or breathing problems possibly associated with any forest fires. As stated above, an attorney's argument is not evidence. *United States v. Velarde–Gomez*, 224 F.3d at 1073. As ECMC did not offer expert testimony to refute Ammondson's methodology or conclusions in the FCE, Ex. 8, the Court assigns little probative weight to the general definitions and normal ranges read from Taber's as they may or may not

relate to Phyllis' condition at any particular time period.

██ Phyllis has shown by a preponderance of the evidence that her state of affairs is likely to persist for a significant portion of the repayment period. *Pena,* 155 F.3d at 1111. Given her health problems, she does not currently work as a cleaning person and manager of the Sandstone low-income housing project. She has no medical insurance, cannot pay for her medicines, and receives free samples of medicine from her doctor which she could not otherwise afford. She cannot afford to see her doctor more often than every six months. Given her inability to buy all the medicines she needs, her health periodically deteriorates until she is unable to work. Tr. pp. 36, 38. At 60 years of age, the Court finds that her state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

ECMC argues that Phyllis failed to show that her situation is hopeless, and that she could perform other work within her physical limitations. The Court disagrees. Other than her art skills Phyllis has no marketable skills other than answering the telephone. Tr. p. 54. She is cleared for sedentary work such as secretary, but has no secretarial skills. Tr. pp. 12–13, 54. She incurred the student loans in question at the suggestion of the employment office in order to attend school to attain marketable skills. This suggested education turned out to be useless. This case is not comparable to *Brown,* where a student loan enabled a person to earn substantially greater income during one's working life. 18 B.R. at 222; *Pederson,* 18 Mont.B.R. at 434. At her age and state of health, the Court sees nothing in the record to support ECMC's contention that Phyllis could perform other work which would pay her enough to repay her student loans. As she is unable to buy even the medicines she needs, she certainly cannot purchase paints and art materials to market her artistic skills. Tr. p. 61. Even

if any evidence existed that she could find work comparable to prior work as a motel clerk or tour guide, no evidence shows that she could earn enough after her medical expenses to pay anything towards her substantial student loan debt, the interest alone on which may run as high as $250 per month. The Court also finds that the facts in the instant case are distinguishable from the facts in both *Hatfield v. William D. Ford Fed. Direct Consolidation Program, et al. (In re Hatfield),* 257 B.R. 575 (Bankr.Mont.2000) and *Gettle v. Sallie Mae Servicing Corp., et al. (In re Gettle),* 257 B.R. 583 (Bankr.Mont.2000). In *Gettle,* the debtor's prior employment history and his testimony concerning his physical and mental ability to work full-time precluded his satisfaction of the second prong of the *Brunner* test. In *Hatfield,* the debtor's age and her doctor's prognosis that the debtor, with proper medication and therapy, could function quite well in her personal life and her employment pursuits, precluded her satisfaction of the second prong. The Court finds in the case, *sub judice,* that Phyllis has satisfied the second *Brunner* prong.

### III. Third Prong.

██ The third prong requires that the debtor has made good faith efforts to repay the student loans. *Pederson,* 18 Mont.B.R. at 441–42; *Pena,* 155 F.3d at 1111; *Brunner,* 831 F.2d at 396. ECMC concedes Phyllis "has shown good faith as defined under the third prong of the *Brunner* test". Ex. B provides further proof of Phyllis' good faith as required under *Brunner,* which requires that a debtor must either make an effort to repay the loans or show "that the forces preventing repayment are truly beyond his or her reasonable control." *Brunner,* 46 B.R. at 755–56; *Pederson,* 18 Mont.B.R. at 441–42. Furthermore, "[s]ince a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even minimal payments on a student loan does not prevent a finding of good faith where the

debtor never had the ability to make payments." *In re Peel*, 240 B.R. 387, 395 (Bankr.N.D.Cal.1999); *Pederson*, 18 Mont. B.R. at 441–42; *In re Lebovits*, 223 B.R. 265, 275 (Bankr.E.D.N.Y.1998); *In re Rose*, 215 B.R. 755, 765–66 (Bankr. W.D.Mo.1997); *In re Clevenger*, 212 B.R. 139, 146 (Bankr.W.D.Mo.1997); *In re Rosen*, 179 B.R. 935, 941 (Bankr.Or.1995).

 Based upon the above-described discussion of Phyllis' health problems and ECMC's admission, the Court finds that she has satisfied the third and final "good faith" prong and that the forces preventing her repayment are truly beyond her reasonable control. *Brunner*, 46 B.R. at 755–56; *Pederson*, 18 Mont.B.R. at 441–42; *In re Holtorf*, 204 B.R. 567, 572 (Bankr. S.D.Cal.1997); *See Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine the dischargeability of particular student loan debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(8).

3. The Plaintiff satisfied her burden of proof under § 523(a)(8) and all three prongs of the test set forth in *Brunner*, 831 F.2d at 396, and *Pena*, 155 F.3d at 1114, and has shown by a preponderance of the evidence that excepting such debts from her discharge would impose on her an undue hardship.

THEREFORE, IT IS ORDERED a separate Judgment shall be entered in this adversary proceeding in favor of Debtor/Plaintiff Phyllis Marie Hurley and against ECMC and the other Defendants; and Plaintiff's educational loans owed to the Defendants are dischargeable and discharged pursuant to 11 U.S.C. § 523(a)(8).