**In re Michael A. NARANJO and Oma L. Naranjo, Debtors.**

**Michael A. Naranjo and Oma L. Naranjo fka Oma L. Frantz, Plaintiffs,**

**v.**

**Educational Credit Management, Corporation, Defendant.**

**Bankruptcy No. 98–60193–B–7. Adversary No. 00–1027.**

United States Bankruptcy Court, E.D. California, Fresno Division.

April 10, 2001.

---

## MEMORANDUM OPINION

W. RICHARD LEE, Bankruptcy Judge.

In this adversary proceeding the plaintiff/debtor Oma Naranjo ("Oma"), who suffers from work related shoulder and back injuries, and her husband, co-debtor Michael Naranjo, ("Michael") (collectively Plaintiffs or Debtors) seek a determination under 11 U.S.C. § 523(a)(8) that denying the discharge of Oma's student loan obligation owing to defendant Educational Credit Management Corporation, ("ECMC")[1] would impose an undue hardship on Plaintiffs. Richard A. Harris of Wild, Carter & Tipton appeared for the Plaintiffs. Miriam Hiser of the Law Of-

---

1. Defendant ECMC is the successor in interest to original defendants United Student Aid Funds, Inc. and Aman Collection Services, Inc. by stipulation and order dated July 5, 2000.

fices of Miriam Hiser appeared for the Defendant.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523(a)(8). This is a core proceeding to determine the dischargeability of a particular debt pursuant to 28 U.S.C. § 157(b)(2)(1). This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052. After careful consideration of the testimony, the documentary evidence, the arguments of counsel and applicable law, the Court finds in favor of the Defendant ECMC.

## PROCEDURAL BACKGROUND

Michael and Oma filed a voluntary petition under chapter 13 of the Bankruptcy Code on October 23, 1998. In January 1999, the Debtors filed a First Amended Chapter 13 Plan which contemplated 100% payment to the unsecured creditors. Oma's employment terminated in February 1999, and the Debtors were not able to confirm their chapter 13 plan. In March 1999, the Debtors voluntarily converted their case to chapter 7 in response to the chapter 13 trustee's Motion to Dismiss. The Debtors received their discharge in July 1999 and the bankruptcy case was closed. In December 1999, they applied to re-open the bankruptcy case to allow the filing of this adversary proceeding to determine dischargeability of Oma's student loan obligation. The matter was tried before the Court on March 23, 2001.

The only witness at the trial was Oma. The parties stipulated to admit all of the exhibits into evidence. In addition, pursuant to Fed.R.Evid. 201(c) the Court *sua sponte* takes judicial notice of the Plaintiffs' bankruptcy schedules signed and filed under penalty of perjury and other properly authenticated documents filed by the Plaintiffs in this bankruptcy proceeding.[2] *In re Anderson,* 130 B.R. 497, 500 (Bankr. W.D.Mich.1991) (Court took judicial notice of the debtor's bankruptcy schedules to determine whether the debtor's financial condition supported her Motion to Waive Fees.)

## FACTS

Oma and Michael are both registered nurses. They were married in 1995. For eight years prior to February 1999, Oma had been employed at Mercy Hospital in Merced, California. The bankruptcy schedules report that Oma earned $38,000 in 1998. Oma is 48 years old. Michael is an RN supervisor at the State prison in Chowchilla, California where he has been employed since 1995. The bankruptcy schedules report that Michael earned $51,541 in 1998. Michael also receives a monthly retirement from the Air Force in the gross amount of $1,315. There was no evidence presented as to Michael's age, nor was there any evidence to show that Michael's income earning capacity would not continue for a significant portion to the student loan repayment period.

**2.** In addition to the adversary proceeding file, the Court has taken judicial notice of the following documents from the Debtors' bankruptcy file: Voluntary Petition and Schedules (filed on Oct. 23, 1998), Chapter 13 Plan (Oct. 23, 1998), Amended Schedules D,E, & F (Jan. 8, 1999), First Amended Chapter 13 Plan (Jan. 8, 1999), Motion to Dismiss (Mar. 17, 1999), Notice of Voluntary Conversion from Ch.13 to Ch.7 (Mar. 31, 1999), Amended

Schedules I and Statement of Intentions (Mar. 31, 1999), Reaffirmation Agreement with Travis Federal Credit Union (June 1, 1999), Chapter 13 Trustee's Final Report and Summary (June 17, 1999), Order Discharging Debtors (July 15, 1999), Order Closing Case/Final Decree (July 27, 1999), and Order Granting Motion to Reopen Case (Dec. 10, 1999.)

Oma attended nursing school in South Dakota between 1979 and 1982. She applied for and received several student loans during that time in the approximate amount of $3,000 per semester. When Oma graduated with an associate degree in nursing, her total student loan obligation was approximately $20,000. Oma was employed as a nurse for the next four years and made payments on the student loans in the amount of $100 to $150 per month. In 1986 she applied for and received a deferment due to personal problems. In lieu of the monthly payments, Oma agreed to apply her income tax refunds against the student loans. Approximately $2,000 was applied from subsequent tax refunds.

On February 9, 1996, Oma signed a consolidated loan agreement to consolidate three outstanding student loans. (Defendant's exhibit "A") The consolidated loan in the amount of $21,352 was payable over twenty years with interest at the rate of 7% per annum. Oma did not make the payments as they came due under the consolidated loan. The evidence was inconclusive as to when or why the payments ceased; however, the parties stipulated at trial that the obligation had a current payoff of $28,174.85 with interest at the rate of 7% per annum payable over the remaining fifteen years of the consolidated loan. The monthly payments would be $251 per month, or $3,012 per year.

In March 1998, Oma seriously injured her right shoulder while moving a patient at the hospital. She continued to work at the hospital with a lighter schedule. Michael and Oma commenced this bankruptcy proceeding in October 1998. Their bankruptcy schedules reported secured debts in the amount of $165,148, priority State and Federal income tax obligations totaling $21,527 and unsecured debts, including the student loan, of approximately $46,883.

In December 1998, while moving another patient, Oma seriously injured her back and re-injured her shoulder. Oma tried to continue working; however, the injuries led to termination of her employment with the hospital in February 1999. Oma received surgery on her shoulder and some therapy for her back. She has been taking, and continues to take, numerous medications. Oma testified that she suffers from frequent muscle spasms in her back, that she cannot lift more than eight pounds, and that she cannot engage in repetitive activities. Oma subsequently developed other medical complications including asthma and an irregular heartbeat. Oma testified that she can no longer work as a nurse, that she has never received vocational rehabilitation training, and that she cannot participate in a meaningful rehabilitation program at this time. Oma has received some short term disability payments from different sources. She has several worker's compensation claims pending against the hospital but did not know the amount or the status of those claims. Oma is also receiving a monthly disability payment in the amount of $464 from a private insurance policy. She anticipates that those payments will continue for three more years.

## APPLICABLE LAW

At the time Plaintiffs filed their voluntary bankruptcy petition on October 23, 1998, 11 U.S.C. § 523(a)(8) read as follows:

(a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to

repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents .... [3]

▮ The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *United States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr. Kan.1982). As the court in *Brown* noted:

It seems universally accepted that "undue hardship" contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy. *Brown*, 18 B.R. at 222. *See also, Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000) ("[T]he existence of the adjective 'undue' in front of the word 'hardship' clearly indicates that Congress intended that the hardship experienced by the debtor must be very severe.")

In addition:

[A] loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to maintain himself and his dependents and to repay the educational debt. *Report of the Comm'n of the Bankr.Laws of the United States,* House Doc. No. 93–137, Part 1, 93rd Cong., 1st Sess. (1973) at 140, nn. 14 and 15, reprinted in *Collier on Bankruptcy,* Appendix 2 at PI-i.

▮ It is the debtor who carries the burden of showing evidence of undue hardship sufficient to discharge a student loan. *Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. 389, 393 (E.D.Mich. 1993).

▮ Courts have identified several factors and tests to consider when determining whether "undue hardship" exists in a particular case. In 1987, The Second Circuit Court of Appeals adopted a three-prong test for determining "undue hardship" in the educational loan context. *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2nd Cir.1987). In 1998, the Ninth Circuit Court of Appeals adopted the *Brunner* test as the appropriate test for determining what constitutes undue hardship under 11 U.S.C. § 523(a)(8). *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir.1998) ("We adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to discharge student loans in bankruptcy pursuant to 11 U.S.C. § 523(a)(8)(B).") In *Pena*, the Court summarized the *Brunner* test as follows:

**3.** Prior to October 7, 1998, § 523(a)(8) provided that educational loans were not dischargeable unless, (A) the loan first became due more than seven years before the date of the filing of the petition (the "seven-year rule"), or (B) excepting the debt from discharge would impose an undue hardship. However, the Higher Education Amendments of 1998, Pub.L. No. 105 § 244, § 971, 112 Stat. 1581, 1837 (1998), eliminated § 523(a)(8)'s "seven-year rule" in all cases filed after October 7, 1998, leaving only the

undue hardship exception to non-dischargeability. This bankruptcy was commenced sixteen days after the effective date of the amendment and the Debtors cannot invoke the possible benefits of the seven-year rule. However, the amendment tends to support the argument that Congress has sought to progressively restrict the cases in which educational debts will be discharged. *White v. U.S. Dept. of Education (In re White)*, 243 B.R. 498, 505 fn. 5 (Bankr.N.D.Ala.1999)

First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. The court noted that this portion of the test "comports with common sense" and had already "been applied frequently as the minimum necessary to establish 'undue hardship.'" *Id.* (citing *In re Bryant*, 72 B.R. 913, 915 (Bankr. E.D.Pa.1987)).

Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.*

Third, the debtor must show "that the debtor has made good faith efforts to repay the loans . . . ." *Brunner*, 831 F.2d at 396. The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). *Pena*, 155 F.3d at 1111.

Section 523(a)(8) was a response to a "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts." *Id.*, (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93–137, Pt. I, 93d Cong., 1st.Sess. (1973) at 140 n. 14). This section was intended to "forestall students . . . from abusing the bankruptcy system." *Pena*, 155 F.3d at 1111.

## DISCUSSION

### *Educational Loan*

■ A creditor seeking to have a student loan debt declared non-dischargeable has the initial burden of proof at trial under all section 523(a)(8) proceedings. To satisfy that burden the creditor must prove: (1) the existence of a debt; (2) for an educational loan; and (3) made, ensured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution. *White*, 243 B.R. at 505.

Plaintiffs do not dispute that the subject loan meets the above definition of obligations covered by section 523(a)(8). Indeed, Plaintiffs allege in paragraph 5 of the Complaint that "Plaintiffs are indebted to Defendants . . . for an educational loan . . . ." Prior to trial the parties stipulated as to the existence and the amount of the debt and the applicable payment terms if the debt is determined to be non-dischargeable. The Court finds that the Defendant's initial burden of proof has therefore been satisfied.

### *Undue Hardship*

Plaintiffs seek a discharge of Oma's student loan arguing that they would suffer undue hardship if required to repay her student loan obligation. To satisfy the first prong of the *Brunner* test Plaintiffs must show, through substantial credible evidence, that they cannot maintain, based on current income and expenses, a "minimal" standard of living for themselves and their dependents if forced to repay the loan. *Pena*, 155 F.3d at 1111; *Brunner*, 831 F.2d at 396. Whether the Plaintiffs can provide life's necessities for themselves and maintain a "minimal" standard of living on the amount of their income is a matter of proof for which the Plaintiffs carry the burden at trial. *White*, 243 B.R. at 508.

■ The "minimal standard of living" analysis is actually a two-step process. First the Court must evaluate the Debtors' present standard of living based upon the

Plaintiffs' lifestyle attributes which appear from the record. Second, the Court must evaluate what impact, if any, forced repayment of the student loan obligation will have on the Plaintiffs' standard of living in relation to the "minimal" reference standard.

■ The Plaintiffs argue that they are barely able to meet their current obligations on Michael's income. Indeed, much testimony and documentary evidence were offered regarding their current income and expenses. Plaintiffs' argument is based on Plaintiffs' actual lifestyle. However, the baseline from which to measure is a "minimal lifestyle." *White*, 243 B.R. at 512. The fact that Plaintiffs may not be able to afford their present standard of living is only one of many factors relevant to an analysis of the lifestyle itself for purposes of the "undue hardship" test under *Brunner*. Ironically, many of the living expenses which Plaintiffs rely upon in support of their case actually reveal attributes of a lifestyle that is relatively comfortable, not the "minimal" lifestyle envisioned by *Brunner*.

■ In evaluating the "undue hardship" question, the Court may also consider matters appearing in the record regarding the Plaintiffs' own choices and conduct which may or may not be consistent with their "undue hardship" contention. The Court should consider the degree to which the Debtors' alleged "hardship" may be self-imposed. *Lezer v. New York State Higher Education Services Corp. (In re Lezer)* 21 B.R. 783, 788 (Bankr.N.D.N.Y. 1982). In the present case, the Court has considered the Plaintiffs' voluntary election to reaffirm a consumer debt which was otherwise dischargeable. The Court has also considered the Plaintiffs' decision to retain and pay for luxury consumer goods which they could have surrendered to the lien holder. Finally, the Court has

considered the Plaintiffs' ability to repay substantial pre-petition tax obligations from their post-petition income. In this case the Court's "undue hardship" inquiry begins and ends with the "minimal standard of living" analysis. In the Court's view, the Plaintiffs already enjoy a standard of living well above the "minimal" level based solely upon Michael's income. Further, it has not been shown that their standard of living will be materially diminished if they are forced to make the $251 per month payments required to service the student loan even if Oma is unable to regain meaningful employment for a significant period of time. The Court finds that the record in this case does not support Plaintiffs' contention that they cannot maintain a "minimal" standard of living if required to repay the consolidated student loan.

■ The Debtors' 1998 Federal income tax return (Defendant's exhibit "E") reports that the Debtors had an adjusted gross income for that year (the last year of Oma's full employment) of $117,060. The 1999 State income tax return (Defendant's exhibit "F") reports an AGI of $74,098, even without Oma's income. Although Oma is the sole obligor on the consolidated student loan, the Court may consider Michael's income for the purpose of evaluating the Debtors' standard of living. *White*, 243 B.R. at 509–510. Numerous courts wrestling with this issue have found that their debtors could enjoy the requisite "minimal" standard of living on substantially less income than the Debtors in this case have at their disposal. *White*, 243 B.R. at 512, fn. 15.

The Plaintiffs own a four-bedroom home in Chowchilla, California, which they purchased in 1996, with an estimated value of $161,000. They support a monthly mort-

gage payment of $1,482.[4] Oma testified that their children all live elsewhere. Michael is obligated to pay $900 per month in court awarded child support for his daughter who lives in Germany, but the Plaintiffs do not appear to have any other dependent obligations. The Plaintiffs enjoy the luxury of frequent long distance telephone conversations with their children resulting in an average telephone bill of approximately $150 per month. Michael funds a monthly retirement contribution through his employer in the amount of $269. The Plaintiffs subscribe to cable television service and computer Internet service. According to their bankruptcy schedules, Plaintiffs have two automobiles which they collectively valued at $10,725. One automobile appears to be free and clear of liens; the other is subject to a secured loan from Travis Federal Credit Union in the amount of $3,664. They recently renewed their membership in the California State Automobile Club and are able to afford travel expenses to the extent of $160 to $200 per month. They spend approximately $500 per month for food and $150 for clothes. Except for Oma's shoulder and back injuries, there was no evidence of any extraordinary health problems or disabilities in the family. Through Michael's employer, they are able to carry medical, dental and vision care insurance. They both maintain their continuing education requirements. Oma even maintains her nursing license even though she testified that she will never again be able to work as a registered nurse.

The Court has also considered the Debtors' voluntary election to reaffirm a consumer debt pursuant to 11 U.S.C. § 524(c) and the "undue hardship" affidavit of Debtors' counsel filed in compliance with section 524(c)(3)[5] in evaluating the Debtors' "undue hardship" claims. In June 1999, the Plaintiffs filed a Reaffirmation Agreement to reaffirm their vehicle secured loan from Travis Federal Credit Union in the amount of $3,664, payable at the rate of $127 per month. The Reaffirmation Agreement was accompanied by the statutorily required declaration from their attorney, Richard Harris, representing, *inter alia*, that reaffirmation of the Credit Union's loan, "... was fully informed and voluntary ... and *does not impose an undue hardship* on Debtor(s) or a dependant of Debtor(s) ...." (emphasis added)

---

4. Upon conversion of the bankruptcy from chapter 13 to chapter 7, the chapter 13 Trustee filed a Final Report and Account which shows that the sum of $13,875 was returned to the Debtors from post-petition plan payments made to the chapter 13 Trustee. Oma testified that his money was paid over to the Debtor's mortgage company to stop a foreclosure against their home.

5. 11 U.S.C. § 524(c) provides in pertinent part:

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—...

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that—

(A) such agreement represents a fully informed and voluntary agreement by the debtor;

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

(C) the attorney fully advised the debtor of the legal effect and consequences of—

(i) an agreement of the kind specified in this subsection; and

(ii) any default under such an agreement ....

The term "undue hardship" appears in both sections 524(c)(3) and in 523(a)(8) and should be read to be consistent with each other. If the Debtors' attorney had not filed the "undue hardship" declaration required by section 524(c)(3), then the Court would have been required to hold a hearing and make an independent finding that the reaffirmation agreement did not impose an "undue hardship" on the Debtors and was in the best interest of the Debtors pursuant to section 524(c)(6). In the Ninth Circuit the Debtors did not have to enter into a reaffirmation agreement with the credit union to keep the automobile. They may keep the vehicle without reaffirming the debt so long as they make the payments on the loan. *McClellan Federal Credit Union v. Parker (In re Parker)*, 139 F.3d 668 (9th Cir.1998). The provisions of the Bankruptcy Code regulating the reaffirmation of debt are intended to protect the Debtors from their own actions, unless they insist in open court that they want to be liable on reaffirmed debt after discharge. *In re Hitt*, 137 B.R. 401, 404 (Bankr. D.Mont.1992). In the Court's view, the Plaintiffs' voluntary election to reaffirm the credit union loan together with their attorney's signing of the requisite "no undue hardship" statement under section 524(c)(3) are inconsistent with the contention that they will suffer "undue hardship" if required to repay the student loan.

The Debtors' election to retain or surrender property secured by consumer debts pursuant to 11 U.S.C. § 521(2)[6] is also relevant to the "undue hardship" analysis. Sometime prior to the bankruptcy,

Plaintiffs purchased a new home sewing machine from Sew & Save against which Sew & Save retained a purchase money lien. The Plaintiffs valued the sewing machine in their schedules at $1,900 but proposed in their chapter 13 plan to pay the full contract balance to Sew & Save in the amount of $3,300 with 10% interest. Upon conversion of the case to chapter 7, the Plaintiffs could have surrendered the sewing machine to Sew & Save and received a discharge of the deficiency obligation. They also could have redeemed the sewing machine pursuant to Bankruptcy Code section 722 by offering to pay Sew & Save the value of its collateral. Instead they filed a Statement of Intention in compliance with section 521(2)(A) electing to keep the sewing machine and to continue the contract payments to Sew & Save. In the Court's view, a $3,300 home sewing machine is a luxury item; and Plaintiffs' election to pay for the sewing machine is inconsistent with the contention that they are unable to maintain a "minimal" standard of living.

Perhaps the most compelling factor in the Court's analysis was the revelation that the Plaintiffs have successfully repaid in excess of $21,500 of pre-petition State and Federal tax liabilities since their bankruptcy was filed and that the source of funds for these payments, State and Federal income tax refunds, is likely to continue in the future. When the Plaintiffs filed their bankruptcy petition, the schedules listed unsecured priority tax claims owing to the IRS in the amount of $20,213 for tax years 1992 through 1997 and to the California Franchise Tax Board in the amount of $1,313 for tax year 1997. Oma testified

---

**6.** 11 U.S.C. § 521 provides in pertinent part: The debtor shall—...

    (2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—

    (A) ... file with the clerk a statement of his intention with respect to the retention or sur-

render of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property ....

that they had been paying these taxes at the rate of $50 per month plus application of their annual tax refunds. The evidence suggests that Michael has been substantially over-withholding his estimated payroll taxes by as much as $500 per month or more. The 1998 Federal income tax return shows that the Plaintiffs qualified for a Federal tax refund that year in the amount of $1,326. The 1999 California income tax return shows that the Plaintiffs qualified for a State tax refund that year in the amount of $2,578. Oma testified that these tax refunds had been applied by the IRS and the Franchise Tax Board to reduce the Debtors' pre-petition income tax obligations. The Plaintiffs received another Federal tax refund for the year 2000 in the approximate amount of $6,000. From that refund, approximately $4,700 was applied by the IRS to complete the pay-off of the Debtors' 1997 tax obligation. The Debtors used the balance of the year 2000 tax refund, approximately $1,300, to purchase tires for their car, to repay a $1,000 loan from Michael's mother, and to pay for other living expenses. Through application of the year 2000 and prior tax refunds, the Plaintiffs' pre-petition tax obligations, totaling $21,527 have now been fully satisfied. Oma also testified that she expected similar income tax refunds from Michael's income to continue in the future "so long as she remains unemployed." In light of the Plaintiffs' ability to pay over $21,500 of pre-petition income tax liability during the 2½ years since their bankruptcy petition was filed, the Court finds that the Plaintiffs will be able to likewise pay the sum of $3,012 per year, or more, to service Oma's student loan obligation without any significant impairment to their standard of living.

In order to obtain a hardship discharge under § 523(a)(8), debtors must show more than mere financial dif-

ficulty; for if that were the requirement, all student loans in bankruptcy would be dischargeable. Undue hardship requires financial hardship combined with other extenuating circumstances. While the Court is not unsympathetic to the fact Plaintiffs did have to seek bankruptcy protection in 1998 and that they may still experience some financial adversity due to the loss of Oma's income and the demands of their current lifestyle, Plaintiffs have not demonstrated the "unique and extraordinary circumstances" required over and above mere financial adversity for which undue hardship is reserved. *Brown*, 18 B.R. at 222.

"Congress has seen fit to erect a high hurdle to debtors seeking to discharge student loan obligations." *Wegrzyniak v. United States of America (In re Wegrzyniak)*, 241 B.R. 689, 696 (Bankr.Idaho 1999). In this case, Plaintiffs have failed to overcome that high hurdle by satisfying all three prongs of the *Brunner* test. Having found that Plaintiffs failed to establish the "minimal standard of living" prong of the *Brunner* test, the Court does not need to rule on the other two prongs.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine the dischargeability of particular student loan debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(8).

3. Plaintiffs have not satisfied their burden of proof under § 523(a)(8). In particular, Plaintiffs have failed to satisfy the first prong of the test set forth in *Brunner*, 831 F.2d at 396, and *Pena*, 155 F.3d at 1114. Plaintiffs did not establish by a preponderance of the evidence that they cannot maintain, based on their current

income and expenses, a "minimal" standard of living for themselves and their dependents if forced to repay Oma's student loans and, thus, that excepting such debt from Plaintiffs' discharge will impose an undue hardship.

BASED ON THE FOREGOING, a separate Judgment shall be entered in favor of defendant Educational Credit Management Corporation and against plaintiffs/debtors Michael and Oma Naranjo holding the subject debt to be non-dischargeable.