**In re Rebecca Edith YAPUNCICH, Debtor.**

**Rebecca Edith Yapuncich, Plaintiff,**

**v.**

**Montana Guaranteed Student Loan Program, Defendant.**

**Bankruptcy No. 00–42851–7.**
**Adversary No. 01/00011.**

United States Bankruptcy Court,
D. Montana.

Sept. 26, 2001.

Robert M. Kampfer, Great Fall, MT, for plaintiff.

Alan C. Bryan, Billings, MT, for defendant.

## ORDER

RALPH B. KIRSCHER, Chief Judge.

Plaintiff/Debtor Rebecca Edith Yapuncich ("Rebecca") commenced this adversary proceeding on January 30, 2001, seeking a determination that excepting her student loan debt owing to the Defendant from her discharge would impose an undue hardship on the Debtor under 11 U.S.C. § 523(a)(8). Successor–Defendant Educational Credit Management Corporation ("ECMC") filed an answer denying that Rebecca's student loan debts are dischargeable on grounds of undue hardship. After due notice, trial of this cause was held at Great Falls on May 22, 2001. Rebecca appeared and testified, represented by attorney Robert M. Kampfer ("Kampfer"). Rebecca's friend Mel Stark ("Stark") also testified. ECMC was represented by attorney Alan C. Bryan ("Bryan"). Plaintiff's Exhibits ("Ex.") 001 through 040, and ECMC's Ex. A, B, C, D, E, F, G, H, and I were admitted into evidence. At the close of the trial the Court took the matter under advisement and granted the parties time in which to submit briefs after preparation of the transcript. The parties' briefs have been filed and reviewed by the Court, together with the record and applicable law. This matter is ready for decision.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding to determine dischargeability of particular debts under 28 U.S.C. § 157(b)(2)(I). This Order contains the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052. For the reasons set forth below, Judgment shall be entered in favor of the Plaintiff discharging a portion of her student loan debts owed to the Defendant pursuant to 11 U.S.C. § 523(a)(8), as excepting such debts from her discharge would impose an undue hardship on her.

## FACTS

Rebecca is 45 years old and a single mother of twin 16–year old sons, Isaac and Reece. They live in a four-bedroom apartment located at 2101 First Avenue North in Great Falls, Montana, which they rent

for $500 per month. Rebecca is licensed and employed with the Great Falls Public School System under a federal Title I program as a reading teacher, and will earn $31,007 in salary for the 2001–2002 school year.

Rebecca currently takes medication and goes to counseling for depression. Both of her sons were diagnosed with and are under medication for attention deficit disorder ("ADD"), but have stopped taking their medication. In addition, Reece may suffer from a serious medical problem known as Crohn's disease, but the diagnosis is not final. Both sons expect to graduate from high school in 2003, when they turn 18, at which time they intend to enlist in the military and leave home.

Rebecca started borrowing money through student loans for college in 1974, and continued borrowing through student loans until 1994. Rebecca earned a B.A. degree in music education K–12 in 1979 from Montana State University in Bozeman; and in 1995 earned teaching endorsements for reading and computer science, for which she earned re-certification in 2000 from the University of Great Falls.

After graduating with her B.A., Rebecca consolidated her student loans and made some payments thereon. In addition, she worked in low-income schools which provided forgiveness of certain student loans in exchange for working at reservation schools and in low income areas. Consequently, Rebecca's $2,500 Perkins loan was totally forgiven. Ex. 028. Rebecca also paid in full a student loan in the amount of $4,000 owed on a New Mexico Educational Assistance Foundation Loan. Ex. 029. While in New Mexico, Rebecca worked as a music teacher in Los Alamos.

After returning to Montana and before returning to college, Rebecca worked in 1992, at a bank in Great Falls for 6 or 7 months and received approximately $6.00 per hour, which was just over the minimum wage. Transcript ("Tr."), pp. 52–53. She also worked as a tennis instructor, swimming instructor, and as an employee at a Dairy Queen for 1 day.

Rebecca was married from July 1997 until November 1998 to a man who never got a full-time job. Tr., p. 35. Rebecca was required to support 5 or 6 people on only her teacher's salary. When they divorced Rebecca was left to pay several of the marital bills, including the phone bill. She lost her phone service, and retained local phone service only by means of placing it in her sons' names, without long distance service [1].

As a teacher in Great Falls Rebecca has received yearly raises under her teacher's contract. During the 1999–2000 her salary was $27,424. Ex. 018. During the 2000–2001 school year her salary was raised to $29,171. Ex. 017 [2]. Her salary for the current school year is $31,007. Tr., p. 55; Ex. 036.

Rebecca attempted to make arrangements with ECMC to repay her student loans in amounts she could manage. She enrolled with Consumer Credit Counseling Corporation ("CCCC") in 1995 and made irregular payments through CCCC until January of 2000. Tr., pp. 45–46. In order

---

1. *Her sons have low-wage part-time jobs. At the time of trial Reece had worked at Dairy Queen for a month and a half, 20 hours per week, and Isaac was taking care of a lawn. Their earnings went mostly toward their own expenses, although they contributed sometimes to gasoline for the car. Tr., pp. 39–40.*

2. The teaching contracts provide for payment of salary in ten equal installments during the year except if the teacher submits a written request to be paid in twelve installments. Rebecca has been paid according to both payment periods. Tr., p. 15.

to make CCCC payments she sacrificed other needs.

She shops in discount stores for clothing, purchases food in bulk, and has not been to a dentist to have her teeth checked for 6 or 7 years. She obtained assistance for paying her power bills from Opportunity, Inc., and borrowed through payday loans with high interest rates to tide her over between paychecks. Tr., p. 29.

Rebecca's largest and most challenging monthly expense has been keeping food on the table for her and her boys. Tr., pp. 38, 56. Rebecca's current monthly food expense is $775, and ECMC stipulated that she hunts wild game and accepts wild game from her brother to help her cover food expenses. Tr., pp. 56, 70. In addition, her friend Stark has given Rebecca loans, gifts and bought groceries for her; she has only repaid some of them. Tr., p. 67.

Rebecca was unable to make regular payments to ECMC on her student loans. ECMC proceeded to obtain a garnishment order against Rebecca and garnished approximately $175 to $215 per month from her salary. Tr., pp. 14–15. ECMC's garnishment of her salary prompted Rebecca to file a petition for bankruptcy relief.[3]

With her attorney, Rebecca analyzed whether she had sufficient income over expenses to file for relief under Chapter 13, but they determined she did not have enough income after expenses to make payments under a Chapter 13 Plan. Tr., p. 18. She filed her Chapter 7 petition on November 13, 2000, together with her Schedules and Statement of Financial Affairs. Schedule D lists a single secured claim in the amount of $3,701.69, secured by a 1988 Isuzu Trooper. At trial Rebecca testified that she blew a rod and a head gasket in her Trooper's engine and she did not have the funds to pay for repairs, so she surrendered the Trooper to the creditor and leased from Stark for a monthly rental of $150.00 a 1988 Lincoln, which has also required extensive repair work. Tr., pp. 31–32; Ex. 026.

Schedule F lists unsecured nonpriority claims totaling $61,596.51, of which the largest single claim is for her student loan debt in the sum of $46,647.70 owed to Montana Guaranteed Student Loan[4]. Ex. D. Schedule I lists her current monthly income as $2,373.02, which includes $318.54 she receives in support payments for her sons. These support payments are in the form of annuities for the boys set up by their father. Tr., pp. 23–25, 57–58; Ex. 019, 020, 021, 022, 027. These support annuities both expire when her sons turn 18 in November of 2002, while they will still be living with Rebecca and in high school. Tr., pp. 24, 51. Rebecca owes taxes on both of her sons' annuities for the years 2000, 2001 and 2002, as she stopped withholding a portion of the annuity payment to pay the applicable tax because she needed the money. Tr., pp. 29–30.

Schedule J shows monthly expenses of $2,683.41, including $675 for food, $300 for transportation/car repairs, $298 for automobile installment payments, $60 for payments on a viola and $216.30 for student loan garnishment. Since then Rebecca surrendered her Trooper and leased the Lincoln from Stark for $150 per month (Ex. 026), surrendered the viola (Ex. 038), and the bankruptcy petition stopped the

---

**3.** The evidence does not clarify whether the garnishment occurred through a state court judgment or through the involuntary garnishment provisions provided to a federal guaranty agency pursuant to 20 U.S.C. § 1095a.

**4.** ECMC's answer states that it holds Rebecca's student loan debts by transfer of her educational promissory notes from Montana Guaranteed Student Loan Program.

garnishment. She testified that her food expense is actually $775 per month[5]. Tr., pp. 28, 56.

Rebecca testified that her last student loan statement showed a loan balance of approximately $48,000 as of July 2000, but Ex. C shows a loan balance of $41,437.45, for all five (5) student loans, as of February 26, 2001, with interest accruing thereon at a per diem of $9.30; Kampfer stipulated during the trial to that amount.

## CONTENTIONS OF THE PARTIES

Rebecca contends that excepting her student loans from her discharge would impose on her and her sons an undue hardship. She argues that her sons' annuities will terminate while her sons are still living with her and finishing high school, further reducing her income while she continues to support them. She contends that she relies on gifts and hunting for her food and support, she has given up her viola and car, and her pay raises are completely absorbed by her expenses and loss of income. Rebecca contends that her situation is likely to persist into the future based upon her depression and the likelihood that her son's diagnosis of Crohn's disease will become active, which will ultimately prevent his planned enlistment in the military.

ECMC admits that Rebecca has made reasonable and good faith efforts to repay her student loans. Notwithstanding, ECMC argues that Rebecca has failed her burden of proving an undue hardship because her current income exceeds her expenses. With respect to whether her financial circumstances are likely to persist, ECMC contends that Rebecca's situation is improving with her failed marriage behind her, that her income from teaching is increasing and that her financial condition will further improve after her boys graduate and leave home. ECMC asserts that all debtors suffer from financial adversity and the policy of repayment of student loans outweighs Rebecca's right to a fresh start.

## DISCUSSION

Section § 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \*

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

■■■ The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *In re Hurley*, 19 Mont. B.R. 73, 79, 258 B.R. 15, 20 (Bankr. Mont.2001); *Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98 (Bankr. N.D.Ohio 1982); *United States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr.Kan. 1982); *Garmerian v. Rhode Island Higher Educ. Assistance Auth. (In re Garmeri-*

---

**5.** Rebecca testified: "[T]he food bill is that large because my boys have always been tremendous eaters. They are very big. They're almost 6'4", wear size 14 shoe, and they constantly eat had they have always eaten me out of house and home. It has been the No. 1 major problem for the past 16 years to keep enough food on the table." Tr., p. 28.

*an),* 81 B.R. 4 (Bankr.R.I.1987). As the court in *Brown* noted:

It seems universally accepted, however, that "undue hardship" contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.

*Brown,* 18 B.R. at 222. On the other hand, the Bankruptcy Code does not require that the debtor "live in abject poverty ... before a student loan may be discharged." *In re Mallinckrodt,* 260 B.R. 892, 900 (Bankr.S.D.Fla.2001) *(quoting In re Faish,* 72 F.3d 298, 305 (3rd Cir.1995)).

In addition:

[A] loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to maintain himself and his dependents and to repay the educational debt.

*Hurley,* 19 Mont. B.R. at 79, 258 B.R. 15, quoting *Report of the Commission of the Bankruptcy Laws of the United States,* House Doc. No. 93–137, Part I, 93rd Cong., 1st Sess. (1973) at 140, n. 14 and 15, reprinted in COLLIER ON BANKRUPTCY, Appendix 2 at PI-i. In the instant case the record shows that Rebecca's student loans allowed her to become a teacher, which has provided her with a moderate, but by no means extravagant, standard of living based upon her increasing teaching income. The record further shows, however, that Rebecca is unable to maintain herself and her dependents and repay her educational debts.

■ In a complaint to determine the dischargeability of student loan debt, a debtor has the burden of proof to show evidence of undue hardship sufficient to discharge the debt. *In re Rifino,* 245 F.3d 1083, 1087–88 (9th Cir.2001); *Hurley,* 19

Mont. B.R. at 80, 258 B.R. 15, *In re Pederson,* 18 Mont. B.R. 429, 434 (Bankr.Mont. 2000), *In re Thomsen,* 17 Mont. 493, 499, 234 B.R. 506, 510 (Bankr.Mont.1999); *Healey v. Massachusetts Higher Educ. (In re Healey),* 161 B.R. 389, 393 (E.D.Mich. 1993); *Rose v. United Student Aids Funds MT (In re Rose),* 6 Mont. B.R. 462, 464 (Bankr.Mont.1988); *Connecticut Student Loan Found. v. Keenan (In re Keenan),* 53 B.R. 913 (Bankr.Conn.1985).

■ Courts have identified several factors and tests to consider when determining whether "undue hardship" exists in a particular case. Since enactment of the Bankruptcy Code, the United States Court of Appeals for the Second Circuit adopted a test for determining "undue hardship" in the educational loan context. *Brunner v. New York State Higher Educ. Services Corp. ("Brunner"),* 831 F.2d 395, 396 (2nd Cir.1987). According to the Second Circuit, in order to gain discharge under 11 U.S.C. § 523(a)(8)(B), a debtor must show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* The Ninth Circuit Court of Appeals adopted the *Brunner* test as the appropriate test for determining what constitutes undue hardship under 11 U.S.C. § 523(a)(8)(B). *United Student Aid Funds v. Pena ("Pena"),* 155 F.3d 1108, 1114 (9th Cir.1998) ("We adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to discharge student loans in bankruptcy

pursuant to 11 U.S.C. § 523(a)(8)(B)"); *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir.2001). In *Pena,* the Court summarized the *Brunner* test as thus,

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner,* 831 F.2d at 396. The court noted that this portion of the test "comports with common sense" and had already "been applied frequently as the minimum necessary to establish 'undue hardship.'" *Id.* (citing *In re Bryant,* 72 B.R. 913, 915 (Bankr.E.D.Pa.1987)).

> Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner,* 831 F.2d at 396. This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.*

> The third prong requires "that the debtor has made good faith efforts to repay the loans...." *Brunner,* 831 F.2d at 396. The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). *[In re] Brunner,* 46 B.R. [752] at 754–55 [(S.D.N.Y.1985)]. Section 523(a)(8) was a response to "a 'rising incidence of consumer bankrupt-

cies of former students motivated primarily to avoid payment of education loan debts.'" *Id.,* (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93–137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14). This section was intended to "forestall students ... from abusing the bankruptcy system." *Id.*

*Pena,* 155 F.3d at 1111. If a debtor fails to satisfy any one of the three prongs the bankruptcy court's inquiry must end with a finding of no dischargeability. *In re Rifino,* 245 F.3d at 1089 [6]; *Faish,* 72 F.3d at 306.

■ In the case *sub judice,* ECMC contends that Rebecca has not satisfied the first two prongs of the *Brunner* test, but concedes she "has made reasonable and good faith efforts to repay her student loans as contemplated by the third prong of the *Brunner* test." ECMC Brief, p. 7. Together with that admission by ECMC, Rebecca's history of participation in loan program consolidation, repayments of her New Mexico student loan and forgiveness of her Perkins loan through employment in low income school districts, the Court finds Rebecca has overwhelmingly satisfied the third and final "good faith" prong of the *Brunner* test, and the Court need address only the first two prongs. As discussed below, the Court concludes that Rebecca has satisfied her burden of proof under the first two prongs of the *Brunner* test by a preponderance of the evidence sufficient to enter a judgment of partial discharge.[7]

---

6. *Rifino,* 245 F.3d 1083 (9th Cir.2001), was decided after *Myrvang,* 232 F.3d 1116 (9th Cir.2000), however, no indication exists whether partial discharge was an issue or was raised at the lower court or on appeal.

7. This court is further aware that the Court in *England v. United States (In re England),* 264 B.R. 38, 51 (Bankr.D.Idaho 2001) (quoting

*Kapinos v. Graduate Loan Ctr. (In re Kapinos),* 243 B.R. 271, 277 (W.D.Va.2000)) stated:

> If the bankruptcy court finds that the *Brunner* standard has been met, it may, in exercise of its equitable power, discharge all of [debtors'] loans or only a portion of them. Likewise, the bankruptcy court may exercise its equitable power under § 105 to discharge a portion of [debtors'] student

## I. First Prong.

■ As set forth above, the *Brunner* analysis starts with an examination of whether the Debtor can maintain a minimal standard of living and still repay her student loan obligations. *Rifino*, 245 F.3d at 1088. To satisfy the first prong the debtor must demonstrate more than simply tight finances. *Rifino*, 245 F.3d at 1088; *In re Nascimento*, 241 B.R. 440, 445 (9th Cir. BAP 1999). In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness. *Id.; see In re Faish*, 72 F.3d at 305 ([T]he Bankruptcy Code does not require that the debtor "live in abject poverty ... before a student loan may be discharged.").

■ The Court observed Rebecca's demeanor while testifying under oath and cross-examination, and finds that Rebecca is a credible witness. *In re Taylor*, 514 F.2d at 1373–74; *Casey v. Kasal*, 223 B.R. at 886. Rebecca's testimony and the exhibits admitted into evidence show more than mere temporary financial adversity. Throughout her sons' lives her efforts have been concentrated on keeping them fed and clothed through failed relationships, fire, and financial adversity while obtaining her teaching degree and licenses. The effort has left her exhausted, suffering from and under medication for depression. She constantly strives, however unsuccessfully, to meet her needs by relying on the charity of her family and friend.

■ ECMC suggests that Rebecca could live in an apartment cheaper than the one she now rents for $500. However, ECMC offered no evidence of cheaper housing available in Great Falls, and the Debtor is not required to live in a substandard tenement to reduce her rent. *See In re Faish*, 72 F.3d at 305. Unlike the

debtors in *In re Gettle*, 19 Mont. B.R. 59, 68, 257 B.R. 583 (2000), as a renter Rebecca does not own her home free and clear of liens. The Court does not consider her $500 per month apartment in Great Falls as anything approaching luxury accommodations, and does not view the "undue hardship" standard as requiring debtors to automatically move into substandard housing in order to support their contention they cannot maintain a "minimal" standard of living if required to repay their student loans. *See In re Naranjo*, 261 B.R. 248, 255–56 (Bankr.E.D.Cal.2001).

Rebecca's hardship is not self-imposed like the debtors in *Naranjo*. In *Naranjo*, the debtors were living in a $161,000 4-bedroom home with a mortgage payment of $1,482. *Naranjo*, 261 B.R. at 255–56. They enjoyed the luxury of frequent long distance telephone conversations with their children in the amount of $150 per month, owned a car free and clear, reaffirmed a vehicle loan and a $3,300 home sewing machine loan and repaid pre-petition state and federal tax liabilities in excess of $21,500. *Naranjo*, 261 B.R. at 255–57. By contrast, Rebecca has struggled for 16 years simply to put food on the table for her and her sons. She lost her phone service, gave up her car and viola, has no luxuries, lives in a $500 apartment, has not received dental care for years, and leases a 13-year old car that needs repair. The Court finds that Rebecca's hardship is not "self-imposed". *See Naranjo*, 261 B.R. at 255–57.

ECMC contends that Ex. 1 shows that Rebecca has $4,043 in discretionary income. However, Ex. 1 plainly represents only her income and certain expenses from January through May of 2001. Ex. 1 does not specifically reference whether the income is a gross or net number with re-

loans even if it finds that the *Brunner*, standard has not been satisfied.

spect to tax withholdings. Ex. 1 is in the same format as Ex. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13; each of which identifies the "bottom line" amount available for all other living expenses such as gasoline, phone, furniture, household goods, union dues, appliance repairs, and other miscellaneous expenses not otherwise accounted for in the identified exhibits. In light of these several exhibits, the Court finds that Ex. 1 does not support ECMC's contentions that Rebecca has $4,043 in discretionary income. The $4,043 must be divided by the 5 months represented by Ex. 1 for a result of $808.60 which is available for all of the miscellaneous monthly expenses of Rebecca's family not otherwise reflected.

Rebecca's Schedules I and J, admitted as part of ECMC's Ex. D, provide a better format for determining whether she can maintain a minimal standard of living and still repay her student loan obligations. Her monthly income on Schedule I is $2,373.02, and her expenses are listed on Schedule J as $2,683.41. Her expenses must be adjusted to remove the $216.30 garnishment, the $60 viola payment, and the $298 installment payment on the Trooper; and to add $100 to the food expense to make it $775 as she testified and the $150 lease payment for Stark's Lincoln. These calculations reflect monthly expenses totaling $2,359.11, leaving a total of $13.91 available for payment to ECMC for her student loans. Ex. C states she owes student loans, interest and fees in the total amount of $41,437.45 as of February 26, 2001, with interest accruing in the per diem amount of $9.30. Thus, ECMC's own Exhibits C and D show that Rebecca's net monthly income could pay less than 2 days' interest on her student loans.

At the time of trial Rebecca's 2001–2002 contract had taken effect, and her salary increased to $31,007, or $3,100.70 each month for 10 months. Ex. 036. Her current tax withholding is not in the record, but even if it did not change from the $838.62 on Schedule J her total combined monthly income would be $2,580.62 [8], leaving a total of $221.51 for repayment to ECMC for her student loans. The interest alone totals $279 in 30 days. Ex. C. Any payment on the principal owed on her student loans only makes her monthly deficit worse, as is reflected in her testimony.

 The record shows and the Court finds that Rebecca easily satisfies the first prong of the *Brunner* test, which requires simply that the Debtor show she cannot repay her student loans and maintain a minimal standard of living. *Pena,* 155 F.3d at 1111; *Naranjo,* 261 B.R. at 254–55 ("The 'minimal standard of living' analysis is actually a two-step process. First the Court must evaluate the [debtor's] present standard of living based upon the [debtor's] lifestyle attributes which appear from the record. Second, the Court must evaluate what impact, if any, forced repayment of the student loan obligation will have on the [debtor's] standard of living in relation to the 'minimal' reference standard."); and *Barron v. Texas Guaranteed Student Loan Corporation (In re Barron),* 264 B.R. 833, 840 (Bankr.E.D.Tex.2001). This prong "comports with common sense". *Id.; Hurley,* 19 Mont. B.R. at 84, 258 B.R. 15; *Brunner,* 831 F.2d at 396; *In re Pederson,* 18 Mont. B.R. at 438. Applying this common sense standard to the evidence, the Court concludes Rebecca has satisfied her burden of proof under the first prong by a substantial preponderance of the evidence. Rebecca is living at a minimal standard of living, engaged in a constant

---

**8.** $31,007 divided by 10 months equals $3,100.70. $3,100.70 − $838.62 = $2,262.08.

$2,262.08 + $318.54 (boys' annuities) = $2,580.62.

struggle to feed her sons, and manages only by resorting to hunting for wild game and accepting charity from friends and family. The evidence shows she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loans. This prong of the *Brunner* test "does not require a debtor to demonstrate that repayment of the loan would cause her and her family to live at or below poverty level." *Barron,* 264 B.R. at 840, *citing Lebovits v. Chase Manhattan Bank (In re Lebovits),* 223 B.R. 265, 271 (Bankr.E.D.N.Y.1998).

## II. Second Prong.

■ To satisfy the second prong of the *Brunner* test Debtor must prove that her state of affairs is likely to persist for a significant portion of the repayment period of the student loans. *Rifino,* 245 F.3d at 1088; *Pena,* 155 F.3d at 1111, *Brunner,* 831 F.2d at 396; *Pederson,* 18 Mont. B.R. at 439. ECMC argues that Rebecca has failed her burden of proof under the second prong because her failed marriage, fires and other personal misfortunes are behind her, her income is increasing and her sons will leave home after graduation. While some of that may be true, the Court notwithstanding finds that the record does not support ECMC's contentions.

The evidence shows that Rebecca's ability to repay her student loans will get considerably worse before it gets better. Her sons are both 16, and they will live with her until they graduate from high school after the 2003 school year[9], after which they plan on entering the military when they will both be 18. Tr., pp. 51–52. Until then, however, they will live with Rebecca for the ensuing period in excess of two years. During that period for a time the household income will decline when her sons turn 18 in November of 2002, at which time the annuity payments which Rebecca receives for their support, about $159.27 per child (Ex. 19, 20, Schedule I), shall cease. Tr. pp. 57–58. After that, not only will Rebecca have to continue to feed and support her 2 sons without their support annuities, but she also remains liable for payment of income taxes on their annuities for the years 2000, 2001, and 2002 which are unpaid because she stopped withholding any portion of the annuity payments to increase her income. Thus, for the near term until graduation in 2003, Rebecca's state of affairs is likely to persist and worsen for a significant portion of the repayment period of the student loans, during which interest continues to accrue. Ex. B, C and I.

ECMC argues that when the boys leave Rebecca's expenses will drastically decline and she will be able to repay her student loans. While that could be true, and her expenses could decline if she no longer has to feed her sons, the evidence also shows that one of her sons may have a serious illness, Crohn's disease, which could prevent his leaving, or force Rebecca to choose between repaying her student loans or abandoning her son to his illness with no support.

ECMC points to Rebecca's increases in salary over the last three years, from $27,424 to $28,185, and to $31,007. Tr., pp. 54–55; Ex. 17, 18, 36. It is true that Rebecca has received modest raises and cost of living increases. However, such increases are tied to increased living expenses. One bankruptcy court explained a situation comparable to Rebecca's:

---

**9.** The Court rejects any inference that Rebecca should not continue to support her sons until they graduate from high school in 2003, even though they turn 18 in November of 2002.

The Debtor is 40 years old and not the typical recent graduate with his entire career ahead of him and an untested earning potential. The evidence at trial demonstrated that he is currently earning very close to the maximum salary he can expect to receive in his field of social work without returning to school and incurring additional student loan liability which he has no hope of repaying. Although he has received, and can expect, modest cost-of-living raises, they are not designed to produce a higher household income. Cost-of-living raises are by definition tied to increased living expenses and designed to maintain the status quo. Therefore, they will not generate future income which will enable the Debtor to repay his Student Loans. Although this Court recognizes that sometimes young debtors fresh out of school, with well-paying jobs, large educational loans and few other debts, file bankruptcy petitions in an attempt to discharge their educational loans before the loans become due, this is clearly a distinguishable situation. The Debtor is not trying to abuse the system; he merely wants a fresh start so that he has an opportunity to pay his current debts as they become due.

*In re Lebovits,* 223 B.R. at 274.

Rebecca is older than Lebovits, and like him she is currently earning close to the maximum salary she can expect to receive in the field of K through 12 teaching in Montana. Her annual modest cost-of-living increases are not designed to produce a higher household income, but rather as in *Lebovits* are designed to maintain the status quo, and will not generate future

income to repay her student loans. *Id.* Like Lebovits, Rebecca is not young, recently out of school with few other debts and an untested earning potential. *Id.* Rebecca is not trying to abuse the system; she merely wants a fresh start so she has an opportunity to pay her current debts as they become due and to support her sons.

Given her age, circumstances, and state of health, the Court sees nothing in the record to support ECMC's contention that Rebecca could or should perform other work[10] which would pay her enough to repay her student loans. The Court finds that sufficient evidence exists in the record to satisfy the second *Brunner* prong, that her state of affairs is likely to persist for a significant portion of the repayment period of the student loans, to justify granting Rebecca a partial discharge.

### III. Partial Discharge.

██ Authority exists in the Ninth Circuit that a partial discharge, rather than a complete discharge, may be granted in the context of a student loan discharge case under § 523(a)(8) where undue hardship does exist but where facts and circumstances require intervention in the financial burden on the debtor to avoid thwarting the purpose of bankruptcy relief.[11] *Myrvang v. Myrvang (In re Myrvang),* 232 F.3d 1116, 1123–25 (9th Cir.2000) (agreeing with the holding of *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 439 (6th Cir. 1998) which allowed partial discharge under § 523(a)(8), and holding that a bankruptcy court has the discretion to order a partial discharge of a separate debt arising

---

**10.** Rebecca testified she tried to work a second job at Dairy Queen, but quit after 12.5 hours because she was exhausted and wanted to spend her time with her sons. Tr., p. 26; Ex. 023.

**11.** *But see* n. 7 above.

from a divorce decree pursuant to 11 U.S.C. § 523(a)(15)).

■ Since the Ninth Circuit has voiced its agreement with *Hornsby's* reasoning that a bankruptcy court has the discretion to grant a partial discharge under § 523(a)(8), this Court holds that it has discretion to grant a partial discharge [12]. *But see, In re Taylor,* 223 B.R. 747, 752–53 (9th Cir. BAP 1998) (prohibiting partial discharge under § 523(a)(8)). The district court in *In re Brown,* 239 B.R. 204, 210–11 (S.D.Cal.1999), criticized and rejected the BAP's view in *Taylor* that § 523(a)(8) requires an all-or-nothing approach, reasoning that such an approach "has the effect of rendering large debt more likely of discharge, and reward[s] irresponsible borrowing." *In re Myrvang,* 232 F.3d at 1123 (quoting *Brown*).

■ This Court considers the holdings in *Brown* and *Myrvang* better reasoned, and agrees that it has the equitable power under § 105(a) to grant a partial discharge [13]. The power to allow a partial discharge is directly linked to another Bankruptcy Code provision, namely § 523. *See Myrvang,* 232 F.3d at 1125. The Court agrees that use of a partial discharge should be reserved for appropriate circumstances, and that it should find that the equities of the situation weigh distinctly in favor of the Debtor. *In re England,* 264 B.R. 38, 51–2 (Bankr.Idaho 2001); *In re Kapinos,* 243 B.R. 271, 277 (W.D.Va. 2000). In these circumstances the Court finds that the equities of the situation weigh distinctly in favor of Rebecca, and deems it appropriate under the exercise of its equitable discretion to fix an appropriate partial discharge of Rebecca's student loan debts.

The evidence shows that Rebecca cannot make any payments on her student loans, at the earliest, until after graduation of her sons from high school in 2003. According to ECMC's Ex. C, by that time her student loan debt will be approximately $49,379.70 [14].

Rebecca testified that it would take her between 19 and 23 years to pay back her student loans assuming no interest. Tr., p. 15. By then she would approach or exceed retirement age even if she were able to make payments. In this Court's view the accrual of interest in the interim would render it impossible for Rebecca to ever repay her student loans. On the other hand, if no interest is charged and the principal is reduced to $20,000, the evidence shows Rebecca would be able to repay that amount just over 114 months at $175 [15], or just over 93 months at $215 [16] if

---

12. This Court has in the past exercised its equitable discretion and granted partial discharge of educational loans. *See, e.g., Thompson v. United States,* 12 Mont. B.R. 60, 69–70, 72–3 (Bankr.Mont.1993) (partially discharging federally guaranteed Health Education Assistance Loan ("HEAL") pursuant to the Court's equitable powers).

13. *Myrvang* was decided and filed November 21, 2000, prior to or near the dates on which this Court's decisions in *In re Marsh,* 19 Mont. B.R. 39, 257 B.R. 569 (Bankr.Mont. 2000); *In re Hatfield,* 19 Mont. B.R. 47, 257 B.R. 575 (Bankr.Mont.2000); and *In re Gettle,* 19 Mont. B.R. 59, 257 B.R. 583 (Bankr.Mont. 2000) were issued.

14. Ex. C states the balance due on 2/26/01 as $41,437.45, with total interest on the five student loans accruing at $9.30 per diem. By the end of June, 2003, when her sons graduate from high school an additional 854 days of interest would have elapsed, adding $7,942.20 in interest charges for a total of $49,379.65.

15. $20,000 divided by $175 = 114.2875 months.

16. $20,000 divided by 215 = 93.023 months.

ECMC were forced to resort again to garnishment. Such a remedy grants substantial relief to Rebecca of over $29,000 in student loan principal and interest, while providing ECMC with a substantial recovery and leaving Rebecca with at least ten years of working life to provide for her retirement. The Court considers such an arrangement as consistent with and an equitable balance of the Debtor's right to a fresh start with the policy underlying § 523(a)(8). *Myrvang,* 232 F.3d at 1123; *Brown,* 239 B.R. at 210–11.

Therefore, Rebecca's 5 student loan debts and all accrued interest thereon owed and owing by the Plaintiff to the Defendant ECMC shown by Ex. C are dischargeable and discharged under 11 U.S.C. § 523(a)(8) except for the principal amount of $20,000, which is excepted from Plaintiff's discharge and shall be payable in monthly payments to be arranged between the parties beginning at the end of June, 2003, at zero percent (0%) interest (APR) until paid in full.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine dischargeability of particular student loan debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(8) except for the principal amount of $20,000, which is excepted from Plaintiff's discharge and shall be payable in monthly payments to be arranged between the parties beginning at the end of June, 2003, at zero percent (0%) interest (APR) until paid in full.

3. The Plaintiff satisfied her burden of proof under § 523(a)(8) and all three prongs of the test set forth in *Brunner,* 831 F.2d at 396, *Rifino,* 245 F.3d at 1087–88, and *Pena,* 155 F.3d at 1114, and has shown by a preponderance of the evidence that excepting all such debts from her discharge would impose on her an undue hardship.

4. The evidence shows appropriate circumstances and the equities of the situation weigh distinctly in favor of granting the Plaintiff a partial discharge of her student loan debts and accrued interest.

IT IS ORDERED a separate Judgment shall be entered in this adversary proceeding for the Debtor/Plaintiff Rebecca Edith Yapuncich; and Plaintiff's educational loans owed to the Defendant ECMC are dischargeable and discharged pursuant to 11 U.S.C. § 523(a)(8) except for the principal sum of $20,000.00 which is excepted from Plaintiff's discharge and shall be payable in monthly payments to be arranged between the parties beginning at the end of June, 2003, at zero percent (0%) interest (APR) until paid in full.